Justice Dirk M. Sandefur delivered the Opinion of the Court.
***412 ¶1 Edward Jones & Company, L.P., Jeremy Kientz, and Nick Ferranto, et al. (collectively Edward Jones), appeal the portion of a judgment of the Montana Fourth Judicial District Court, Missoula County, denying their motion to compel arbitration of post-termination claims asserted against them by former Edward Jones employee Adam Bucy.
¶2 We address the following restated issues on appeal:
1. Whether Bucy waived his challenge to the enforceability of the 1998 NASD Form U4 and 2003 arbitration agreements by failing to cross-appeal?
2. Whether the 2003 arbitration agreement was illusory or lacking in mutuality due to Edward Jones' retention of a limited right to seek injunctive relief?
3. Whether the 1998 and 2003 arbitration agreements had an illegal or void object absent an explicit explanation and waiver of ***413 Montana constitutional rights?
4. Whether the 1998 and 2003 arbitration agreements were unenforceable in equity as unconscionable?
5. Whether Bucy's post-termination claims were arbitrable within the express scope of the 1998 and 2003 arbitration agreements?
¶3 We reverse and remand for further proceedings.
FACTUAL AND PROCEDURAL BACKGROUND
¶4 Adam Bucy worked for Edward Jones for approximately 19 years between 1996 and 2015, primarily as a financial advisor in the Edward Jones branch office in Missoula, Montana. As pertinent, Edward Jones is a Missouri-based investment brokerage engaged in the business of providing securities investment and related financial management and planning services. Edward Jones is a *817 federally registered broker and a registered member of the Financial Industry Regulatory Authority, Inc. (FINRA).
¶5 FINRA is a private organization of "investment bankers, dealers, and brokers" with "congressionally delegated self-regulatory authority" to enforce member compliance with federal securities laws[1] and to promulgate and enforce supplemental regulations under the regulatory oversight of the Securities and Exchange Commission (SEC). Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc. , 616 F.2d 1363, 1365-67 (5th Cir. 1980) (citing 15 U.S.C. § 78o ). See also Nat'l Ass'n of Sec. Dealers, Inc. v. SEC , 431 F.3d 803, 804 (D.C. Cir. 2005). FINRA is the SEC-approved corporate and legal successor of the National Association of Securities Dealers, Inc. (NASD), under the 1934 Securities and Exchange Act, as amended (1934 Act). NASD formed in 1939 as a "self-regulatory organization" (SRO) under the 1934 Act, as amended in 1938. See 15 U.S.C. §§ 78a, 78o. FINRA formed in 2007 upon the SEC-approved merger of the member regulatory and arbitration functions of the NASD, New York Stock Exchange (NYSE), and NYSE Regulation, Inc. See NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority - FINRA , FINRA (July 30, 2007), https://perma.cc/DY33-6EFP. As pertinent here, applicable NASD and ***414 FINRA Rules were approved by the SEC pursuant to its regulatory authority under § 19(b)(1) of the 1934 Act, as amended. See 15 U.S.C. § 78s(b)(1), (c) ; Credit Suisse First Boston Corp. v. Grunwald , 400 F.3d 1119, 1130-32 (9th Cir. 2005).[2]
¶6 In 1996, after obtaining a bachelor's degree in finance from the University of Montana, Bucy applied for and obtained employment with Edward Jones as a financial advisor in St. Louis, Missouri. At all times pertinent, Edward Jones was and is a securities broker or brokerage registered with the SEC under the 1934 Act ( 15 U.S.C. § 78o(a)(1) ). As a means of similarly subjecting them to federal securities laws and regulations, the SEC and NASD/FINRA require approved registration (licensing) of broker principals and representatives[3] as a condition of employment with employing member-brokers. See FINRA Rules 0140, 1210; NASD Rules 0115, 1021, and 1031.[4]
¶7 In 1998, Bucy applied for NASD registration as a representative of Edward Jones. He submitted a signed NASD Form U4 (Uniform Application for Securities Industry Registration) for registration in association with Edward Jones. See NASD Rule 1013(a)(1)-(2).[5] At the time, NASD Rules applied to all NASD broker-members and associated persons and imposed on associated persons the "same duties and obligations" under the Rules as members. NASD Rule 0115.[6] In pertinent part, NASD regulations prescribed a comprehensive Code of Arbitration Procedure "for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any [NASD] member or arising out of the employment or termination of ***415 employment of associated person(s) with any member ... between or among members and associated *818 persons." NASD Rule 10101(b).[7] In pertinent part, the Rules then generally required arbitration of any:
dispute [or] claim ... between or among members and/or associated persons ... arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s)....
NASD Rule 10201(a).[8] In accordance with NASD Rules 0115, 10101(b), and 10201(a)(2), Bucy's Form U4 included the following standard arbitration agreement:
I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm ... that is required to be arbitrated under the rules, constitutions, or by-laws of [NYSE and NASD] as may be amended from time to time and that any arbitration award rendered against me may be entered as a [judgment] in any court of competent jurisdiction.
See also NASD Rule 1013(a)(1)-(2).
¶8 In 2003, Bucy relocated to work in the newly opened Edward Jones branch office in Missoula. Incident to the transfer, Bucy voluntarily executed a new employment agreement with Edward Jones to work as a registered "investment representative." Bucy expressly agreed:
that any dispute, claim or controversy arising under this Agreement or as a result of [his] employment with Edward Jones between [he] and Edward Jones or any present or former employee, agent, officer, director ... of Edward Jones shall be resolved by arbitration and without resort to litigation in court. Any arbitration proceedings shall be conducted in accordance with the rules then in effect of the Boards of Directors of the [NYSE] or the [NASD]. This agreement to arbitrate disputes shall survive the termination of your employment with Edward Jones.
...
You agree to ... strictly adhere to the rules and regulations of the SEC, NASD, NYSE and state securities regulators, and all other applicable rules and regulations.
Directly above the signature line, the agreement further prominently ***416 stated in bold script:
THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.
¶9 In the spring of 2015, after twelve years as a successful financial advisor in Missoula,[9] Bucy became "disaffected by" the "culture" at Edward Jones and "began looking for new employment." Between April and June 2015, he was negotiating with LPL Financial (LPL), a "Boston-based financial planning" firm, to work as a registered LPL representative and financial advisor in the Missoula area. Bucy alleges that, at some point, Edward Jones "intercepted [his] emails or phone calls and learned" of his intent to leave for new employment with a "competing financial planning business." He further asserts, and Edward Jones denies, that Edward Jones then had developed a "corporate pattern and practice of blackballing 'breakaway' brokers" to prevent them from working for competitors. On or about May 28, 2015, one of Bucy's Edward Jones clients filed a complaint with FINRA alleging that Bucy conducted an unauthorized transaction on the client's account. Bucy alleges that Edward Jones encouraged the client to file the complaint upon learning of his intent to leave the firm.
*819 ¶10 The client complaint immediately triggered an internal review by Edward Jones and a separate licensing investigation by FINRA. Incident to its internal review, Edward Jones contacted and communicated with several of Bucy's existing Edward Jones clients, some of whom later testified that Edward Jones personnel told them that Bucy had given them bad advice and mishandled their accounts. While the Edward Jones review and FINRA investigation were pending, Bucy's negotiations with LPL Financial came to a successful conclusion in late June, resulting in his execution of a written contract, on July 19, 2015, for prospective employment with LPL. Bucy subsequently informed Edward Jones of his intent to resign, effective July 31, 2015.
¶11 On July 30, 2015, the day before the effective date of Bucy's ***417 resignation, a second Edward Jones client filed a FINRA complaint against him. As with the first client complaint, Bucy alleges that Edward Jones encouraged the client to file the complaint. On July 31, 2015, Bucy resigned from Edward Jones to take new employment with LPL Financial. Edward Jones subsequently circulated an internal memo notifying staff of Bucy's "voluntary" termination and that he had accepted a job at another financial services firm.
¶12 Upon the termination of employment of a registered representative, FINRA regulations require former employers to file an electronic FINRA Form U5 terminating the representative's FINRA registration with that member-broker. See FINRA Bylaws, Article V, Section 3(a). The web-based electronic Form U5 prompts the reporting member to report the manner of termination, whether "Deceased," "Discharged," "Permitted to Resign," "Voluntary," or "Other." If the member-broker reports the manner of termination as "Permitted to Resign," "Discharged," or "Other," the form requires the member to "provide" further "explanation" of the reason for termination. Form U5 filings are publicly available by query on FINRA's internet website.
¶13 On August 4, 2015, Edward Jones filed a FINRA Form U5 reporting the termination of Bucy's employment. Contrary to its earlier staff memorandum stating that the termination was "voluntary," Edward Jones' U5 filing reported that Bucy was "permitted to resign" under the following circumstances:
MR. BUCY RESIGNED WHILE UNDER AN INTERNAL REVIEW THAT STARTED AFTER THE FIRM RECEIVED A CLIENT COMPLAINT ALLEGING UNSUITABLE RECOMMENDATIONS AND DISCRETIONARY TRADING.
Three weeks later, on August 26, 2015, Bucy's new firm (LPL) rescinded its new employment contract with him.
¶14 In the immediate wake of Bucy's departure from Edward Jones, his successor at Edward Jones contacted and consulted with a number of Edward Jones clients formerly served by Bucy. Six of them later filed FINRA complaints alleging that Bucy mishandled their accounts while at Edward Jones. Several of the new complainants subsequently testified that Edward Jones personnel encouraged them to file FINRA complaints against Bucy based on Edward Jones' assertions that he gave them bad financial advice and mishandled their accounts in violation of FINRA Rules.
¶15 On June 27, 2016, Bucy filed a complaint against Edward Jones, et al., in the Montana Fourth Judicial District Court asserting claims for statutory blacklisting ( § 39-2-803, MCA ), statutory defamation ( § 27-1-801, MCA ), and common law tortious interference with his ***418 prospective business relationship with LPL. On August 31, 2016, FINRA notified Bucy that it had completed its investigation and was closing his file without further action. On September 26, 2016, Edward Jones moved the District Court to dismiss and compel arbitration of Bucy's claims on the asserted basis that they were subject to arbitration under NASD/FINRA regulations, the arbitration agreement in his 1998 Form U4 application, and his 2003 employment contract with Edward Jones. In response, Bucy asserted that his claims were "post-termination" claims beyond the scope of the 1998 and 2003 arbitration agreements and that, even if not, they were in any event unenforceable as a threshold matter of law. *820 ¶16 In January 2017, in a somewhat imprecise manner, the District Court compelled arbitration "as to transactions occurring during [Bucy's] employment," but denied arbitration of "post-employment claims" without prejudice pending further discovery regarding the threshold arbitrability of those claims. In July 2017, following limited discovery, Edward Jones renewed its motion to compel arbitration of Bucy's post-termination claims. On August 9, 2018, the court denied the renewed motion on the asserted ground that Edward Jones had failed to develop any additional facts indicating that Bucy's post-termination claims were arbitrable within the scope of his 1998 and 2003 arbitration agreements. Edward Jones timely appealed. Bucy responded in opposition but did not cross-appeal.
STANDARD OF REVIEW
¶17 We review district court rulings on motions to compel arbitration de novo for correctness under the governing standards of the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., or Montana Uniform Arbitration Act (MUAA), § 27 -5-111, MCA, et seq., as applicable. Lenz v. FSC Sec. Corp. , 2018 MT 67, ¶ 12, 391 Mont. 84, 414 P.3d 1262. Upon a district court grant or denial of a motion to compel arbitration in response to a motion to dismiss or for summary judgment, we review the order for correctness under the applicable standards of M. R. Civ. P. 12(b) or 56. Lenz , ¶ 12. If the court granted or denied the motion upon an evidentiary hearing,[10] we review the ***419 court's findings of fact for clear error and its conclusions of law de novo for correctness. Lenz , ¶ 12.
DISCUSSION
¶18 Congress enacted the FAA in 1925 to offset "widespread judicial hostility to arbitration agreements" and place them "on equal footing with all other contracts." Thompson v. Lithia Chrysler Jeep Dodge of Great Falls , 2008 MT 175, ¶ 12, 343 Mont. 392, 185 P.3d 332 ; AT&T Mobility, LLC v. Concepcion , 563 U.S. 333, 339, 131 S. Ct. 1740, 1745-46, 179 L.Ed.2d 742 (2011) ; Buckeye Check Cashing, Inc. v. Cardegna , 546 U.S. 440, 443-44, 126 S. Ct. 1204, 1207-08, 163 L.Ed.2d 1038 (2006). "The FAA encompasses a discrete body of substantive federal law mandating enforcement of arbitration agreements within its scope regardless of any contrary substantive or procedural state law." Peeler v. Rocky Mt. Log Homes Can., Inc. , 2018 MT 297, ¶ 12, 393 Mont. 396, 431 P.3d 911 (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp. , 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L.Ed.2d 765 (1983) ). The FAA governs agreements to arbitrate disputes "arising out of" contracts or transactions "involving" interstate "commerce." 9 U.S.C. § 2 ; Southland Corp. v. Keating , 465 U.S. 1, 10-17, 104 S. Ct. 852, 858-61, 79 L.Ed.2d 1 (1984) ; Zigrang v. U.S. Bancorp Piper Jaffray, Inc. , 2005 MT 282, ¶ 10, 329 Mont. 239, 123 P.3d 237.[11] The FAA thus governs arbitration agreements required by or regarding matters governed by the 1934 Act or the related Security Act of 1933. See 9 U.S.C. § 2 ; 15 U.S.C. § 78b (necessity of 1934 Act regulation of national securities markets and nationally traded securities in interstate commerce); Davis v. Birr, Wilson & Co. , 839 F.2d 1369, 1375 (9th Cir. 1988) (recognizing Commerce Clause as source of federal regulatory authority under the 1934 Act); U.S. v. Wolfson , 405 F.2d 779, 783 (2d Cir. 1968) (recognizing Commerce Clause as source of federal authority for Security Act of 1933). A party may assert the right to compel arbitration *821 either by affirmative claim for relief or as an affirmative defense to an adverse claim. See 9 U.S.C. §§ 3 - 4, 6, 204 ; Am. Sugar Refining Co. v. Anaconda , 138 F.2d 765, 766-67 (5th Cir. 1943). ***420 ¶19 Arbitration agreements governed by the FAA are "valid, irrevocable, and enforceable" except "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration agreements are thus subject to all "generally applicable contract defenses," including without limitation lack of mutual assent or consideration, fraud, duress, or unconscionability, but not "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." Concepcion , 563 U.S. at 339, 131 S. Ct. at 1746 (quoting Doctor's Assocs., Inc. v. Casarotto , 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L.Ed.2d 902 (1996) ). State law may not defeat arbitration agreements based on "special rules which apply only to arbitration" agreements. Iwen v. U.S. W. Direct , 1999 MT 63, ¶ 26, 293 Mont. 512, 977 P.2d 989 (citing Casarotto , 517 U.S. at 687, 116 S. Ct. at 1656 ). Accord Kortum-Managhan v. Herbergers NBGL , 2009 MT 79, ¶ 17, 349 Mont. 475, 204 P.3d 693. Upon a contested petition or motion to compel arbitration, the court must consider, as properly placed at issue in a particular case, whether the arbitration agreement is enforceable under generally applicable principles of contract law and, if so, whether the terms of the agreement require arbitration of the particular matter or type of matter at issue. Howsam v. Dean Witter Reynolds, Inc. , 537 U.S. 79, 84, 123 S. Ct. 588, 592, 154 L.Ed.2d 491 (2002) ; Mont. Pub. Emps. Ass'n v. City of Bozeman , 2015 MT 69, ¶ 7, 378 Mont. 337, 343 P.3d 1233 ( MPEA ). Except as clearly and unambiguously otherwise provided by contract, the question of whether an issue is substantively arbitrable is a threshold question for judicial determination. Howsam , 537 U.S. at 83-84, 123 S. Ct. at 591-92 ; AT&T Techs., Inc. v. Commc'ns Workers of Am. , 475 U.S. 643, 649, 106 S. Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) ; MPEA , ¶¶ 7, 14 ; Greater Missoula Area Fed'n of Early Childhood Educators v. Child Start, Inc. , 2009 MT 362, ¶ 26, 353 Mont. 201, 219 P.3d 881.
¶20 Under generally applicable contract law, the essential elements of a valid and enforceable contract are: (1) "identifiable parties capable of contracting"; (2) mutual consent of the parties; (3) "a lawful object"; and (4) mutual consideration. Section 28-2-102, MCA ; Kortum , ¶ 18. Consent must be "free, mutual, and communicated by each" party to the other. Franks v. Kindsfather , 2005 MT 51, ¶ 31, 326 Mont. 192, 108 P.3d 487 ; §§ 28-2-102, -301, MCA. A valid contract requires the mutual assent of the parties on all essential terms. Lenz , ¶ 18 (quoting Keesun Partners v. Ferdig Oil Co. , 249 Mont. 331, 337, 816 P.2d 417, 421 (1991) (internal citations omitted)). Contract terms to which the parties did not mutually assent are not valid and enforceable against a party who did not assent. See Kortum , ¶ 18 ;
***421 Keesun Partners , 249 Mont. at 337, 816 P.2d at 421. See also §§ 28-2-102(2), -301, -303, -401, MCA. "The threshold validity and enforceability of an arbitration agreement is a question of law but the limited role of the court is to enforce and give effect to the lawful agreement of the parties." Lenz , ¶ 17.
¶21 1. Whether Bucy waived his challenge to the enforceability of the 1998 NASD Form U4 and 2003 arbitration agreements by failing to cross-appeal?
¶22 In accordance with our general contract analysis in Lenz , ¶¶ 16-23, Bucy asserts on various grounds that the arbitration agreements in his 1998 Form U4 application and 2003 employment agreement are unenforceable as a threshold matter of law. Edward Jones asserts that Bucy waived his threshold enforceability challenge by failing to raise it by cross-appeal. Bucy counters that he sufficiently raised his unenforceability assertions below and that cross-appeal was not necessary to preserve them for appellate review in response to the related issue raised on appeal by Edward Jones. We agree with Bucy.
¶23 A party aggrieved by any aspect of an appealable judgment waives appellate review absent timely appeal in accordance with the Montana Rules of Appellate Procedure.
*822 Cadena v. Fries , 2015 MT 90, ¶ 25, 378 Mont. 409, 346 P.3d 347 ; City of Missoula v. Robertson , 2000 MT 52, ¶ 19, 298 Mont. 419, 998 P.2d 144 (citing Fed. Energy Admin. v. Algonquin SNG, Inc. , 426 U.S. 548, 560, 96 S. Ct. 2295, 2302, 49 L.Ed.2d 49 (1976) ). Similarly, a party aggrieved by any issue "separate and distinct" from the issue(s) raised by an opposing party on appeal must generally cross-appeal to preserve the issue for appellate review. Walker v. State , 2003 MT 134, ¶¶ 48-49, 316 Mont. 103, 68 P.3d 872 (citing Billings Firefighters Local 521 v. City of Billings , 1999 MT 6, ¶ 31, 293 Mont. 41, 973 P.2d 222 ) (internal citations omitted); Hughes v. Lynch , 2007 MT 177, ¶ 5, n.1, 338 Mont. 214, 164 P.3d 913 ; Johnson v. Tindall , 195 Mont. 165, 169, 635 P.2d 266, 268 (1981) ; Mittelstadt v. Buckingham , 156 Mont. 407, 414, 480 P.2d 831, 835 (1971) ; Francisco v. Francisco , 120 Mont. 468, 470, 191 P.2d 317, 319 (1947). A responding "party seek[ing] to change any part of the judgment below" must raise the issue by cross-appeal. Robertson , ¶ 19. Failure to timely file and perfect a cross-appeal on an appealable issue generally constitutes a waiver of the issue and precludes appellate jurisdiction to review the issue. See Walker , ¶¶ 48-49.
¶24 However, for purposes of cross-appeal, an issue is not "separate and distinct" from issues raised by the appellant if the respondent: (1) was the prevailing party below; (2) responsively raised the issue on appeal in defense of the judgment at issue; and (3) previously raised ***422 the issue below regardless of whether relied on, rejected, or considered in the lower court decision. Nasca v. Hull , 2004 MT 306, ¶¶ 17-18, 323 Mont. 484, 100 P.3d 997 (quoting Robertson , ¶ 20 ). In Nasca , in granting a motion to dismiss due to lack of personal jurisdiction, the District Court concluded that exercise of specific jurisdiction over the third-party defendants under M. R. Civ. P. 4(B)(1) would violate due process. Nasca , ¶¶ 10, 15. On appeal, the third-party defendants responsively defended the due process ruling, but further asserted that specific jurisdiction was in any event lacking under M. R. Civ. P. 4(B)(1) as a threshold matter. Nasca , ¶ 15. In response, the appellant asserted that the respondent-defendants waived any challenge to specific jurisdiction under Rule 4(B)(1) by failing to cross-appeal. Nasca , ¶ 16. Noting that they raised both issues below, were the prevailing parties on the due process ruling, and responsively raised it on appeal in defense of the lower court judgment, we held that the respondent-defendants' specific jurisdiction challenge was not an issue "separate and distinct" from the due process issue but, rather, an included "sub-part" of a larger multi-part "analysis required of the court" that, if successfully raised on appeal, would "moot" appellate review of the issue raised by the appellants. Nasca , ¶¶ 17-18.
¶25 Likewise here, Bucy was ultimately the prevailing party on whether his post-termination claims were arbitrable within the scope of the subject arbitration agreements. He timely challenged arbitrability below on that ground and on the additional ground that the arbitration agreements were themselves unenforceable as a threshold matter of law. Regardless of the District Court's disregard of the threshold enforceability issue, it was a necessary sub-part of the larger two-prong arbitrability analysis at issue below-whether the parties entered into a valid and enforceable agreement to arbitrate and whether the terms of the agreement required arbitration of the particular matter or type of matter at issue. See Howsam , 537 U.S. at 84, 123 S. Ct. at 592 ; MPEA , ¶ 7. We hold that Bucy did not waive his threshold enforceability challenge by failing to cross-appeal.
¶26 2. Whether the 2003 arbitration agreement was illusory or lacking in mutuality due to Edward Jones' retention of a limited right to seek injunctive relief?
¶27 Inter alia , valid contract formation requires mutuality of consideration-valuable consideration on or for both sides of the agreement. See § 28-2-102, MCA ; Kortum , ¶ 18. As pertinent, the essential reciprocal consideration on the face of the arbitration agreement in Bucy's 1998 FINRA Form U4 filing was his agreement to arbitrate a specified scope of disputes, and thereby implicitly waive ***423 available judicial remedies, in return for the necessary securities industry registration (licensing) required by federal law to work as a representative of a securities *823 broker or brokerage. Similarly, as pertinent, the essential reciprocal consideration on the face of the arbitration agreement in the 2003 employment agreement was Bucy's agreement to arbitrate a specified scope of disputes, and thereby implicitly waive available judicial remedies, in return for employment on other specified terms and conditions with a broker-employer prohibited by federal law from employing unregistered representatives as financial advisors.
¶28 Whether as a consideration of unconscionability or a stand-alone formation defect, Bucy asserts that the 2003 arbitration agreement lacked mutuality because it required him to waive ordinarily available judicial remedies while unfairly preserving an injunctive relief remedy for Edward Jones.[12] However, Bucy's assertion fails to recognize that FINRA Rule 13804, like NASD Rule 10335 before it, authorizes either or both parties to a pending arbitration to seek limited preliminary or permanent injunctive relief as an adjunct to arbitration. Bucy's assertion further fails to recognize that the FAA independently provides for limited injunctive relief, available to any party, to facilitate and enforce arbitration awards. See 9 U.S.C. § 13. Bucy's argument finally fails to recognize the expressly limited nature of Edward Jones' retained right to seek available injunctive relief-to protect against misappropriation of trade secrets and other proprietary information "pending ... arbitration" and thereby "preserve the status quo that existed prior to any alleged breach of this Agreement, pending the outcome of such arbitration." We must construe this express contract language in the context of the broad scope of matters mutually committed to arbitration by both parties under the arbitration agreement, the NASD and succeeding FINRA Rules that Bucy expressly acknowledged and agreed to adhere to, as well as the generally applicable post-arbitration judicial remedy available to all under 9 U.S.C. § 13. Against this backdrop, Bucy has made no factual or legal showing that the limited injunctive relief remedy preserved to Edward Jones in the parties' 2003 employment agreement renders the arbitration agreement either illusory or oppressive. Whether asserted as a consideration of unconscionability or a stand-alone formation ***424 defect, we hold that the 2003 arbitration agreement was not illusory, lacking in mutuality, or unreasonably one-sided or oppressive due to Edward Jones' retention of a limited right to seek injunctive relief.
¶29 3. Whether the 1998 and 2003 arbitration agreements had an illegal or void object absent an explicit explanation and waiver of Montana constitutional rights?
¶30 In addition to compliance with generally applicable statutory and common law contract principles, "arbitration agreements must also comply with [Montana] constitutional standards generally applicable to contracts." Lenz , ¶ 19 ; Kortum , ¶¶ 25-27. By nature, arbitration agreements generally effect a waiver of applicable state and federal "constitutional rights to full legal redress, jury trial, due process of law, and equal protection of law."[13] Lenz , ¶ 19 ; Kortum , ¶ 26. A waiver of fundamental Montana constitutional rights is valid only if knowing, voluntary, and intelligent under the totality of circumstances. Lenz , ¶ 19 ; Kortum , ¶¶ 26-27 ; Park v. Mont. Sixth Jud. Dist. Ct. , 1998 MT 164, ¶ 36, 289 Mont. 367, 961 P.2d 1267. We have never required an explicit explanation or waiver of Montana constitutional rights in arbitration agreements but have previously identified those, inter alia , as considerations that may be relevant to whether a valid contract waiver occurred in a particular case. See Lenz , ¶ 19 (paraphrasing factors discussed in Kortum , ¶ 27 ). However, the Kortum factors are not rigid requirements-whether a valid contract waiver of Montana constitutional rights occurred is a question of fact under the totality of circumstances of each case. See Lenz , ¶ 19.
*824 ¶31 Here, Bucy correctly points out that neither of the arbitration agreements at issue were the product of arms-length negotiation. Then-governing NASD regulations dictated the terms of his 1998 Form U4 agreement and Edward Jones similarly dictated the terms of his 2003 employment agreement in accordance therewith. Bucy further correctly points out that he had no significant bargaining position in either case, he did not specifically initial the arbitration agreements in the larger contracts, and neither agreement included an explicit explanation or waiver of his Montana constitutional rights. Moreover, some significant degree of disparity in business experience and sophistication likely existed between Bucy and Edward Jones at the outset of his career in 1998 and, to a lesser degree, in 2003.
***425 ¶32 However, it is beyond genuine material dispute on the record that, in 1998, Bucy was a highly intelligent and educated person with a bachelors' degree in finance from the University of Montana who was knowingly seeking professional licensing and employment as a representative of a securities broker in the highly regulated securities industry. In 2003, after working for Edward Jones for four-plus years, he was at least similarly capable and knowledgeable, if not more, as he transitioned to Missoula to work as a licensed representative of a securities broker or brokerage. Bucy voluntarily signed the 1998 standard Form U4 licensing application and subsequent 2003 employment agreement and is thus presumed to have read and understood the meaning of their clear and unambiguous language. Lenz , ¶ 22 (internal citations omitted). The record is further devoid of any factual showing, or even allegation, of incapacity, mutual mistake, fraud, misrepresentation, or other tortious conduct affecting assent. "A party to a clear and unambiguous written contract [language] cannot avoid its legal consequences simply by later claiming that [he or] she did not understand the legal consequences of the plain language of the contract." Lenz , ¶ 22 (internal punctuation and citation omitted).
¶33 In pertinent part, the 1998 Form U4 clearly and unambiguously stated that Bucy:
agree[d] to arbitrate any dispute, claim or controversy that may arise between me and my firm ... [and] is required to be arbitrated under the rules, constitutions, or by-laws of [NYSE and NASD] as may be amended from time to time and that any arbitration award rendered against me may be entered as a [judgment ] in any court of competent jurisdiction.
(Emphasis added). The language of his 2003 employment agreement even more explicitly provided clearly and unambiguously that:
any dispute, claim or controversy arising under this Agreement or as a result of [his] employment with Edward Jones between [he] and Edward Jones or any present or former employee ... of Edward Jones shall be resolved by arbitration and without resort to litigation in court . Any arbitration proceedings shall be conducted in accordance with the rules then in effect of the Boards of Directors of the [NYSE] or [NASD]. This agreement to arbitrate disputes shall survive the termination of [Bucy's] employment with Edward Jones .
(Emphasis added). Directly above the signature line, the agreement prominently stated in bold script, "THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." (Emphasis added). Bucy further ***426 expressly "agree[d] to ... strictly adhere to the rules and regulations of the SEC, NASD, NYSE and state securities regulators, and all other applicable rules and regulations." The language of the 1998 and 2003 arbitration agreements thus clearly and unambiguously indicated that Bucy agreed to resolve a broad scope of potential future disputes by arbitration rather than through the judicial legal system and process otherwise ordinarily available in the absence of such agreements.
¶34 There is no evidence or assertion that, if so inclined, Bucy did not have the opportunity or ability to consult with counsel prior to executing either of the arbitration agreements at issue. Nor is there any record indication that Bucy signed either of the arbitration agreements under extraordinary or undue economic, social or practical duress-the agreements were the requirement *825 or function of SEC-approved NASD regulations rather than independently compelled by a private party in commerce. Further, there is no evidence or assertion that, at the time of execution, the NASD or Edward Jones "lulled" Bucy "into a belief" that the arbitration agreements "would not be enforced." See Kortum , ¶ 27.
¶35 Finally, the lack of explicit reference in either of the agreements to Montana constitutional rights is insignificant in this case. The 1998 agreement was part of a standard form agreement conforming to SEC-approved NASD regulations executed incident to his new employment with Edward Jones in Missouri . See 15 U.S.C. § 78s(b)(1), (c), as amended; NASD Rules 0115(a), 1013(a)(1)-(2), 10101(b), 10201(a)(2). The 2003 arbitration agreement similarly conformed to the same SEC-approved NASD regulations related to his anticipated employment in Montana.[14] Bucy has provided no authority or analysis for his implied assertion that Montana constitutional waiver requirements can in any event override SEC-approved regulations, authorized and promulgated under the 1934 Act of Congress. Consequently, in the federally-regulated securities context, whether federal securities laws and regulations require arbitration in a particular context is a significant, if not dispositive, consideration of whether a valid waiver of Montana constitutional rights has occurred, or is even necessary, in an arbitration agreement governed by federal law under the 1934 Act. See also Credit Suisse , 400 F.3d at 1132 (SEC-approved SRO rules "preempt state law when the two are in conflict"). Under the totality of the circumstances of this case, we hold that the ***427 1998 and 2003 arbitration agreements were not illegal, void, violative of public policy, or otherwise unenforceable due to lack of an explicit explanation and waiver of Montana constitutional rights.
¶36 4. Whether the 1998 and 2003 arbitration agreements were unenforceable in equity as unconscionable?
¶37 In pertinent part, the 1998 Form U4 clearly and unambiguously stated that Bucy:
agree[d] to arbitrate any dispute, claim or controversy that may arise between me and my firm ... [and] is required to be arbitrated under the rules, constitutions, or by-laws of [NYSE and NASD] as may be amended from time to time and that any arbitration award rendered against me may be entered as a [judgment ] in any court of competent jurisdiction.
(Emphasis added). The language of his 2003 employment agreement even more explicitly provided clearly and unambiguously that:
any dispute, claim or controversy arising under this Agreement or as a result of [his] employment with Edward Jones between [he] and Edward Jones or any present or former employee ... of Edward Jones shall be resolved by arbitration and without resort to litigation in court . Any arbitration proceedings shall be conducted in accordance with the rules then in effect of the Boards of Directors of the [NYSE] or [NASD]. This agreement to arbitrate disputes shall survive the termination of [Bucy's] employment with Edward Jones .
(Emphasis added).
¶38 As a generally applicable principle of contract law, an otherwise validly formed contract, or included term, is unenforceable if the contract or term is equitably unconscionable. Lenz , ¶ 26 (internal citations omitted). A contract or included term is equitably unconscionable if (1) the contract or term is a contract or term of adhesion and (2) "unreasonably favors the stronger party or is unduly oppressive to the weaker party." Lenz , ¶ 26. A contract or term of adhesion is a contract or included term dictated by a "party in superior bargaining position" to a "weaker party on a take it or leave it basis without any reasonable opportunity for negotiation." Lenz , ¶ 26. "Preprinted, standard-form consumer contracts are typically contracts of adhesion." Lenz , ¶ 26 (citing Woodruff v. Bretz, Inc. , 2009 MT 329, ¶¶ 8-11, 353 Mont. 6, 218 P.3d 486 ).
¶39 Here, though not consumer contracts, the preprinted, standard-form 1998 NASD Form U4 and 2003 Edward *826 Jones employment agreements were unquestionably contracts of adhesion respectively dictated by SEC-approved NASD regulations and by ***428 Edward Jones in conformance therewith. Whether a contract or term of adhesion "unreasonably favors the stronger party or is unduly oppressive to the weaker party, is a mixed question of fact and law under the totality of circumstances surrounding the execution of the contract." Lenz , ¶ 31. "In addition to the non-exclusive Kortum factors, other relevant considerations may include, inter alia , whether the disputed" contract terms were "common in prior dealings between the parties, whether the weaker party carefully reviewed the agreement, and whether the stronger party personally explained the nature and consequences of the disputed term." Lenz , ¶ 31 (internal citations omitted). However, we have previously recognized that, "absent a fiduciary relationship or other special relationship of trust and reliance, securities brokers and advisors have no duty to further explain the legal consequences of a clear, explicit, and conspicuous arbitration agreement" to clients. Lenz , ¶ 31 ; Chor , 261 Mont. at 149-53, 862 P.2d at 30-32. Likewise here, in hiring or employing registered representatives, federally-registered securities brokers and brokerages have no duty to further explain the legal consequences of a clear, explicit, conspicuous, and unambiguous arbitration agreement required by or conforming to SEC-approved regulations.
¶40 As in our foregoing analysis regarding Montana constitutional rights, neither the Kortum factors nor other relevant considerations in this case indicate that the terms and circumstances of the arbitration agreements in the 1998 Form U4 or 2003 employment agreements were either unreasonably favorable to NASD or Edward Jones[15] or unduly oppressive to Bucy. Arbitration agreements in standard-form NASD/FINRA Form U4 applications and related broker-representative employment agreements conforming to SEC-approved regulations have been, and remain, standard requirements of federal law governing the employment of registered representatives by registered securities brokers and brokerages. See NASD Rules 0115, 1013(a)(1)-(2), 1031, 10101(b), 10201(a)(2); FINRA
***429 Rules 0140, 1013(a)(1)-(2), 1210, 13101(a), 13200(a).
¶41 In 1998, Bucy was a highly intelligent and educated person with a bachelors' degree in finance who was knowingly seeking professional licensing and employment as a representative of a securities broker in the highly regulated securities industry. In 2003, he was even more knowledgeable after working in the industry for several years. While there is no evidence that he carefully studied the 1998 and 2003 arbitration agreements or consulted with counsel before signing, or that NASD or Edward Jones further explained their nature and consequences, there is also no evidence that he was incapable of understanding their clear and unambiguous language or the existence and pertinent requirements of the then-governing NASD regulations regarding arbitration.
¶42 "Agreements to arbitrate disputes in accordance with SEC-approved procedures are not unconscionable as a matter of law." Chor , 261 Mont. at 149-50, 862 P.2d at 30 (citing Cohen v. Wedbush, Noble, Cooke, Inc. , 841 F.2d 282, 286 (9th Cir. 1988) ).[16] The express language of the arbitration *827 agreements in Bucy's 1998 Form U4 application and 2003 employment agreement is clear and unambiguous. He has made no showing that the agreements did not conform to then-governing NASD regulations regarding arbitration. Under the totality of the circumstances of record, we hold that the subject 1998 and 2003 arbitration agreements were not unconscionable in equity.
¶43 5. Whether Bucy's post-termination claims were arbitrable within the express scope of the 1998 and 2003 arbitration agreements?
¶44 The construction and interpretation of contract language is a question of law. Krajacich v. Great Falls Clinic, LLP , 2012 MT 82, ¶ 13, 364 Mont. 455, 276 P.3d 922 (internal citations omitted); Mary J. Baker Revocable Tr. v. Cenex Harvest States, Coops. Inc. , 2007 MT 159, ¶ 19, 338 Mont. 41, 164 P.3d 851 (internal citations omitted). Courts must generally construe unambiguous contract language in accordance with the plain meaning of the language in ordinary usage.
***430 Section 1-4-107, MCA.
¶45 In his 1998 Form U4 application Bucy expressly "agree[d] to arbitrate any dispute [or] claim ... that may arise between me and my firm ... [and] is required to be arbitrated under [NASD]" or succeeding Rules. In turn, NASD regulations required arbitration of any "dispute [or] claim ... between or among members and/or associated persons" either:
(1) "arising in connection with the business of such [NASD] member(s)";
(2) "in connection with the activities of such associated person(s)"; or
(3) "arising out of the employment or termination of employment of such associated person(s)...."
NASD Rule 10201(a). Superseding FINRA Rules now similarly require arbitration of any "dispute ... between or among ... Members and Associated Persons" and "aris[ing] out of the business activities of a member or an associated person. ..." FINRA Rule 13200(a). Bucy's 2003 employment agreement similarly requires arbitration of disputes or claims between them "arising under this [a]greement or as a result of [his] employment with Edward Jones. ..."
¶46 Edward Jones is unquestionably a "Member," as defined by and referenced in FINRA Rules 0160(b)(10), 13100(q), and 13200(a). At all times pertinent, Bucy was an "Associated Person" as defined by and referenced in FINRA Rules 1011(b), 13100(b), (u), and 13200(a). The currently governing FINRA Code of Arbitration Procedure for Industry Disputes does not define the terms "arising out of" or "business activities" as referenced in Rule 13200(a). See FINRA Rule 13100. However, the plain meaning of those terms in ordinary usage is clearly and unambiguously broad. In ordinary usage, the phrase disputes "arising out of the business activities" of a specified person or entity simply means a dispute regarding or related to the activities in which the specified person or entity is or was engaged. At all times pertinent, both before and after the termination of Bucy's employment, Edward Jones was and is engaged in the business of providing securities investment and related financial management and planning services to clients through its authorized employees and agents in accordance with governing federal securities laws and regulations, including FINRA and NASD regulations, and pertinent industry standards of care. While employed as a registered representative of Edward Jones, Bucy was engaged in the business of performing and carrying-on the business of Edward Jones in accordance with governing federal securities laws and regulations, including pertinent FINRA and NASD
***431 regulations, under the direction of Edward Jones and the terms of his employment.
¶47 As stated in his District Court complaint, and subsequently prosecuted on the record in this case, the predicate factual allegations underlying Bucy's claims, and implicated legal duties and alleged breaches or violations, all directly regard and relate to *828 the conduct of Edward Jones' business activities, both before and after the termination of Bucy's employment. They similarly directly relate to Bucy's business activities as an employee of Edward Jones. Thus, as referenced in FINRA Rule 13200(a), all of Bucy's claims "arise[ ] out of the business activities of a member or an associated person. ..."[17] As referenced in his 2003 employment agreement, they are similarly disputes or claims "arising under this [a]greement or as a result of [his] employment with Edward Jones. ..." We hold that Bucy's claims were and are mandatorily arbitrable pursuant to FINRA Rule 13200(a), within the scope of his 1998 NASD Form U4 application, and within the scope of his 2003 employment agreement.
CONCLUSION
¶48 Bucy did not waive his threshold enforceability challenge by failing to cross-appeal. The arbitration agreement in Bucy's 2003 employment agreement was not illusory, lacking in mutuality, or unreasonably one-sided or oppressive due to Edward Jones' retention of a limited right to seek injunctive relief. The 1998 and 2003 arbitration agreements were not illegal, void, violative of public policy, or otherwise unenforceable due to lack of an explicit explanation and waiver of Montana constitutional rights. Nor were they equitably unenforceable as unconscionable. We hold that Bucy's claims were and are mandatorily arbitrable pursuant to FINRA Rule 13200(a) and within the scope of the arbitration agreements in his 1998 Form U4 ***432 application and 2003 employment agreement. The District Court's August 9, 2018 judgment denying Edward Jones' motion to compel arbitration of Bucy's post-termination claims is hereby reversed and this matter is remanded for entry of an order compelling arbitration of all of Bucy's claims and dismissing this action.
¶49 Reversed and remanded.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
LAURIE McKINNON, J.
BETH BAKER, J.
INGRID GUSTAFSON, J.
JIM RICE, J.

" '[S]ecurities laws' means the Securities Act of 1933 (15 U.S.C. [§] 77a et seq. ), the Securities Exchange Act of 1934 (15 U.S.C. [§] 78a et seq. ), the Sarbanes-Oxley Act of 2002, the Trust Indenture Act of 1939 (15 U.S.C. [§] 77aaa et seq. ), the Investment Company Act of 1940 (15 U.S.C. [§] 80a-1 et seq. ), the Investment Advisers Act of 1940 (15 U.S.C. [§] 80b et seq.), and the Securities Investor Protection Act of 1970 (15 U.S.C. [§] 78aaa et seq. )." 15 U.S.C. § 78c(47).

Pursuant to M. R. Evid. 201(b)-(c) and 202(3), the Court takes judicial notice of the SEC-approved FINRA Rules, including FINRA bylaws, Rules, and predecessor NASD Rules. See FINRA Manual , FINRA, https://perma.cc/4JJ8-RCTT (last visited July 19, 2019).

The requirements for registration of representatives of securities brokers include passage of an initial competency examination and satisfaction of continuing education requirements. See FINRA Rule 1210; NASD Rule 1031(a).

Though FINRA Rules have succeeded and superseded the prior NASD Rules, both are cited here where relevant given the nature of Bucy's assertions of error on appeal.

See now, FINRA Rule 1013(a)(1)-(2).

See now, FINRA Rule 0140.

See now, FINRA Rule 13101(a).

See now, FINRA Rule 13200(a).

It is undisputed that, during his tenure at Edward Jones, Bucy "rose through the ranks," "passed multiple financial planning and securities licensure tests," and at times managed "roughly $40,000,000.00" in client assets with only one customer complaint prior to 2015 and the events now at issue. In response to the 2012 complaint, Edward Jones placed Bucy under a six-month "Heightened Supervision" requiring him "to seek prior written approval from [his] supervisor before switching a client's investment from one long-term product to another. ..." Bucy thereafter "completed hundreds of transactions for [his] clients" between "October 10, 2013 and June 30, 2016" without seeking prior approval and without objection or exception from Edward Jones.

If a motion to compel arbitration is not amenable to disposition under M. R. Civ. P. 12(b) or 56, a district court may conduct summary proceedings to resolve genuine issues of material fact where the court "sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion. ..." Engalla v. Permanente Med. Grp., Inc. , 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 938 P.2d 903, 915-16 (1997). Accord § 27-5-115(1), MCA ; Lenz , ¶¶ 3-9 ; Kloss v. Edward D. Jones & Co. , 2002 MT 129, ¶¶ 12-16, 310 Mont. 123, 54 P.3d 1 ; Chor v. Piper, Jaffray & Hopwood, Inc. , 261 Mont. 143, 147-48, 862 P.2d 26, 29 (1993). See also 9 U.S.C. §§ 2 -4.

The MUAA governs arbitration agreements subject to Montana law but not governed by the FAA. See § 27-5-111, MCA, et seq. The MUAA constitutes a discrete statutory overlay of general contract law mandating enforcement of arbitration agreements governed by Montana law. See § 27-5-114, MCA.

It is unclear in Bucy's briefing whether he raises the injunctive relief issue as a threshold formation issue, as a consideration of equitable unconscionability, or both. We thus separately address this issue in isolation.

See Mont. Const. art. II, §§ 4, 16 -17, 26 (right to equal protection of law, access to courts, due process of law, and jury trial); U.S. Const. amend. XIV (right to due process and equal protection of law).

The agreement further expressly provided that "[t]his [a]greement shall be deemed to be a Missouri contract and governed by the laws" thereof.

NASD/FINRA broker-member employers are expressly intended third-party beneficiaries of the arbitration agreements included in standard Form U4 NASD/FINRA applications for registration of representatives of registered brokers and brokerages. MONY Sec. Corp. v. Bornstein , 390 F.3d 1340, 1342 (11th Cir. 2004) ; In re Prudential Ins. Co. of Am. Sales Practice Litig. , 133 F.3d 225, 229-30 (3d Cir. 1998) ; O.N. Equity Sales Co. v. Venrick , 508 F. Supp. 2d 872, 874-75 (W.D. Wash. 2007). Accord Shen v. CMFG Life Ins. Co. , No. CV 15-11593-MLW, 2016 WL 1129308 at *2-3, 2016 LEXIS 37006 at *6-8 (D. Mass. Mar. 4, 2016), report and recommendation adopted , 2016 WL 1189125, 2016 LEXIS 37001 (D. Mass. Mar. 22, 2016) ; Marciano v. MONY Life Ins. Co. , 470 F. Supp. 2d 518, 523 (E.D. Pa. 2007).

Accord Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 207 (2d Cir. 1999) ; Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc. , 170 F.3d 1, 17 (1st Cir. 1999) ; Koveleskie v. SBC Capital Mkts., Inc. , 167 F.3d 361, 366-68 (7th Cir. 1999) ; Seus v. John Nuveen & Co. , 146 F.3d 175, 184 (3d Cir. 1998) ; Flowers v. Wells Fargo Advisors, LLC , No. 7:12-CV-00052-BR, 2013 WL 361106 at *3-4, 2013 LEXIS 21323 at *7-10 (E.D. N.C. Jan. 30, 2013) ; Simmons v. Morgan Stanley Smith Barney, LLC , 872 F. Supp. 2d 1002, 1017-18 (S.D. Cal. 2012) ; Richert v. Nat'l Arbitration Forum, LLC , Civil No. 09-763 ADM/JJK, 2009 WL 3297565 at *13, 2009 LEXIS 96160 at *5, 13 (D. Minn. Oct. 13, 2009) ; Millas v. Morgan Stanley & Co. , No. 08-cv-0573-MJR, 2008 WL 5095917 at *5, 2008 LEXIS 97154 at *7-14 (S. D. Ill. Dec. 1, 2008).

See similarly Zolezzi v. Dean Witter Reynolds, Inc. , 789 F.2d 1447, 1450-51 (9th Cir. 1986) ; Aspero v. Shearson Am. Express, Inc. , 768 F.2d 106, 109 (6th Cir. 1985) ; Shen , 2016 WL 1129308 at *2-3, 2016 LEXIS 37006 at *29-30 ; Kost v. PNC Bank, Nat'l Ass'n , No. 4:15-cv-00056-RLY-WGH, 2015 WL 5521817, *1, 2015 LEXIS 124157, *9-10 (S.D. Ind. Sept. 17, 2015) ; Wells Fargo Advisors, LLC v. Quantum Fin. Partners , LLC , No. 15-9145-JAR-JPO, 2015 WL 5053631 *1, 2015 LEXIS 113038 *15-16 (D. Kan. Aug. 25, 2015) ; Kouromihelakis v. Hartford Fire Ins. Co. , 48 F. Supp. 3d 175, 185, (D. Conn. 2014) (quoting Genesco, Inc. v. T. Kakiuchi & Co. , 815 F.2d 840, 846 (2d Cir. 1987) ); Hawkins v. Questar Capital Corp. , No. 5:12-cv-000376, 2013 WL 5596897 *3-4, 2013 LEXIS 147130 *10-12 (E.D. Ky. Oct. 11, 2013) ; Lorbietzki v. Merrill Lynch, Pierce, Fenner & Smith, Inc. , No. 2:10-cv-01585-RLH-PAL, 2011 WL 855354, *2, 2011 LEXIS 29601, *8-10 (D. Nev. Mar. 8, 2011) ; Johnson v. Charles Schwab & Co. , No. 09-81479-Civ-Ryskamp/Vitunac, 2010 LEXIS 16771, *6-11 (S.D. Fla. Jan. 26, 2010); and Millas , 2008 WL 5095917 at *4-5, 2008 LEXIS 97154 at *16-17.