FILED

09/20/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0133

22-0133

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 175

MEGAN SAYLER,

      Petitioner and Appellee,

  v.

YAN SUN,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DR-20-949
Honorable Donald L. Harris, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

        Melinda A, Driscoll, Fred Law Firm, PLLC, Billings, Montana

        Morgan E. Dake, Crowley Fleck, PLLP, Billings, Montana

      For Appellee:

        Penelope S. Strong, Attorney at Law, Billings, Montana

Submitted on Briefs:  November 2, 2022

Decided:  September 20, 2023

Filed:

               _____
                          Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Yan Sun (Father) appeals from the August 2021 and February 2022 judgments of the Montana Thirteenth Judicial District Court, Yellowstone County, adjudicating a parental interest and accompanying parenting plan regarding his minor child (T.S.J.) in favor of his nonparent ex-wife Megan Sayler (Surrogate). We address the following restated issues:

1. *Whether the District Court erroneously concluded that the parties' California Gestational Carrier Agreement (GCA) did not preclude Surrogate from later establishing a parental interest in the subject child under Montana law?*

2. *Whether the District Court erroneously failed to conclude that the parent-child relationship provision of the parties' subsequent Montana premarital agreement was unenforceable due to lack of voluntary consent of Father?*

3. *Whether the District Court erroneously failed to conclude that the parent-child relationship provision of the parties' Montana premarital agreement was equitably unconscionable?*

4. *Whether the District Court erroneously concluded that the parties' post-surrogacy premarital agreement and Surrogate's ensuing relationship with the child were sufficient to create a third-party parental right regarding the child?*

We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Father is a Chinese national who entered the United States in May 2017 at age 20 under a student visa to study at Alabama's Auburn University in an English-speaking business program catered to international students.[1] With the financial support and

---

[1] He further asserts that he also left China to avoid government persecution after Chinese police killed his father.

assistance of his mother and remaining family in China, Father later decided to have a child in the United States through a private California surrogacy company specializing in surrogate child births in accordance with California Family Code §§ 7960 through 7962 (authorizing and providing for assisted reproduction agreements for gestational carriers and uncontested judicial confirmation of sole parentage in client parent). He reasoned that surrogacy was his best opportunity to father a child because he is a homosexual male and surrogacy is illegal in China.

¶3 After engaging the California surrogacy company, Father selected a company-associated surrogate candidate (Surrogate) who was an unacquainted 32-year-old single mother of two children (ages 8 and 4) residing and regularly employed in Billings, Montana.[2] After the company conducted a lengthy and comprehensive suitability evaluation of Father and Surrogate through various associated surrogacy professionals (*inter alia* including a company-provided Chinese-speaking social worker), Father and Surrogate executed a 72-page California law Gestational Carrier Agreement (GCA) in February 2019. In pertinent essence, the GCA provided for: (1) an in vitro fertilization procedure in California (i.e., a sperm specimen from Father, female ovum from an anonymous third-party donor, and surgical implantation of the resulting embryo in Surrogate's uterus); (2) Surrogate's return to Montana and carriage of the implanted embryo to term for birth in Montana; (3) immediate and unconditional Surrogate

---

[2] The District Court found that Father chose Surrogate because she was willing to work with him despite his youth and HIV status.

3

relinquishment of the newborn to Father upon birth as the "sole legal parent" with no parental or custodial right or interest acquired or retained by Surrogate; (4) Surrogate's corresponding written agreement that "the best interests of the [c]hild will be served with" Father "as the [c]hild's only parent" and in his "sole legal and physical custody"; (5) Surrogate's consent and cooperation in "any legal process necessary to confirm" Father's sole "parental rights" in the child; and (6) specified compensation of Surrogate in the total amount of $53,500.00. Each party separately entered into the GCA with the advice and assistance of independent counsel. Under the GCA, a separate contract with the California surrogacy company, and with funds provided by his mother in China, Father ultimately paid more than $200,000 for the subject surrogacy services.

¶4     As particularly pertinent here, the GCA provided:

> [Surrogate] shall neither form, nor attempt to form, any relationship, including, without limitation, a parent-child relationship, with the [c]hild, and subject to applicable laws, hereby freely, readily, and immediately waives all parental rights and/or any claim of parental rights, if any, to the [c]hild and shall fully assist and aid [Father] in confirming and legalizing his parent-child relationship with the [c]hild.
>
> [SURROGATE] FULLY ACKNOWLEDGES SHE SHALL NOT HAVE ANY PARENTAL OR CUSTODIAL RIGHTS OR OBLIGATIONS TO THE CHILD AND [SURROGATE] IS NOT THE LEGAL, NATURAL, OR BIOLOGICAL MOTHER OF THE CHILD.

GCA §§ 3.1 and 3.2. The GCA further expressly provided that "all questions concerning its validity," construction/interpretation, performance, and enforcement "shall be governed by, and . . . in accordance with," California law. The agreement nonetheless provided, however, that the GCA "and the [p]arties . . . have a significant relationship to the State of

4

Montana, in addition to the State of California (as stated . . . in [GCA] Section 32.1)." The GCA was expressly subject to amendment "only by" a subsequent signed written agreement of the parties. Before the expected birth of the baby in Billings, a California Superior Court entered an uncontested judgment on December 20, 2019, decreeing in accordance with the GCA that: (1) Father was "the genetic, legal, and sole parent" of the subject child; (2) Surrogate "is . . . <u>not</u> to be a legal parent" of the child; and (3) "[i]t is in the best interest of" the expected child "that sole legal and physical custody of [the] child . . . be with [Father]."

¶5 On December 27, 2019, the subject child (baby-boy T.S.J.) was born in Billings, three weeks before his expected due date. Father had originally planned to be in Billings for the birth, and then temporarily stay there with the child in a rental home for the next month before returning to school in Alabama. Upon notice of the unexpected early birth, Father immediately flew to Billings and rented an *Airbnb* home in downtown Billings while Surrogate and the baby remained in the hospital for a couple of days.[3] In accordance with Chinese custom, the plan was for Father's mother to come to the United States to help care for and raise the baby while he finished school. The plan went awry, however, when his mother was unable to obtain a visa for travel to the United States due to Covid-19 pandemic restrictions and related complications.

---

[3] The District Court found that Surrogate, Father, and the baby "spent two or three days in the hospital" following the birth.

5

¶6     Upon discharge from the hospital, Surrogate offered to drive Father and child to his *Airbnb* rental to drop them off as previously agreed. On arrival, however, concerned about the safety of the downtown location, and Father's lack of experience in caring for a newborn baby alone, Surrogate invited him and the baby to temporarily stay at her home until he could find a more suitable temporary rental. Upon accepting the offer, Father began intermittently staying at Surrogate's home, where she thereafter helped him with the newborn when they were there. On January 5, 2020, less than two weeks after the child was born, based on her immediate emotional attachment to the child and awareness of Father's desire to remain in the United States and his unanticipated child care problem, Surrogate proposed that she and Father enter into a platonic legal marriage for the purposes of allowing her to continue to have a relationship with the baby by helping him care for and raise the child, and thereby allowing him to continue his university schooling in Billings and facilitate his eligibility to obtain a United States Citizenship and Immigration Services "green card" allowing him to lawfully remain indefinitely in the United States upon eventual expiration of his student visa. She proposed that his mother could then "give [Surrogate] the [monetary] amount [his mother] . . . [had] previously" "offered" to assist him with child care costs and living arrangements in the United States.[4]  In her proposal,

---

[4] While she later asserted in a November 2020 affidavit that she did not "learn" that Father was "gay" until March 2020, an attached document included in the affidavit exhibits (containing a list captioned "Information Given Before Marriage") stated that Father "is homosexual." *Inter alia*, a contemporaneous January 5, 2020, text message from Surrogate to Father similarly stated:

> I really hope you take me up on the marriage offer. I'd really like if you and [T.S.J.] moved out here, *maybe even your roommate too*. I can definitely help you with the

Surrogate made no mention of any contemplation of her using their platonic marriage as a basis for adoption or other means of acquisition of a legal parental or custody interest regarding his child. She did advise him, however, of her intent to see a lawyer to obtain a draft premarital agreement for their mutual consideration as a means to formalize and implement their uncommon marital arrangement. Father tentatively agreed to Surrogate's marriage proposal as generally explained. The District Court later found that, upon discussion, the parties agreed to get married because: (1) they "both wanted to raise [the child] together"; (2) Surrogate would then help Father "gain admission to MSU-Billings to obtain a college degree"; (3) the marriage would allow her to add him "to her employ[ment] health insurance" coverage; and (4) it would "help [him] obtain a green card for immigration purposes."

¶7 On January 20, 2020, a week before their upcoming January 27th civil marriage ceremony, Surrogate provided Father a proposed written premarital agreement independently drafted by her lawyer pursuant to Title 40, chapter 2, part 6, MCA. In pertinent part, the proposed agreement:

(1) included separate attached exhibits identifying various items of property, with itemized valuations, then owned individually by each party;

(2) provided that, in the event of a future marital dissolution proceeding, all property previously or subsequently acquired in either of their "sole name[s]," would be "separate non-marital property" respectively retained

---

baby while you finish school[,] and if we are married[,] you'll be able to become a U.S. citizen.

(Emphasis added.) The referenced "roommate" was Father's homosexual boyfriend, another Chinese national residing in the United States.

and distributed to each accordingly, and thus not subject to equitable division under § 40-4-202, MCA;

(3)     provided that "[i]t is agreed that [Surrogate] has a parent[-]child relationship with" the subject child T.S.J. "as that term is used under [§] 40-4-211, MCA"; and

(4)     provided that each party "fully understands the terms, provisions, and legal consequences of this agreement" upon the opportunity of each to separately consult with independent counsel if so inclined.

Four days later on January 24th, without consultation with a lawyer or other legal professional, Father voluntarily signed the premarital agreement before a Billings notary public. The parties then married in a civil ceremony three days later on January 27, 2020.

¶8     Following the marriage through June 1, 2020, Father and child intermittently alternated between staying at Surrogate's home and staying with his boyfriend at various rentals in Billings. Beginning in March or April 2020, Father's boyfriend also began staying with him in Surrogate's home when he and the child were there. After their marriage, Father regularly deposited $900 per month in a joint checking account, purportedly for Surrogate's "living expenses." He deposited additional amounts at various times, including a $100,000 payment in July 2020 that was purportedly "gifted" to Surrogate by his mother for the purchase of a new home of his choosing, but in Surrogate's sole name because he was not eligible for a mortgage, and mortgage regulations required Surrogate to account for the source of borrower-supplied funds for the purchase. Upon execution of a buy-sell agreement for the purchase of a five-bed, three-bath home in Billings intended by the parties to accommodate Surrogate, her two children, Father, the child, and Father's boyfriend, the transaction closed in September 2020. However, after

8

all moved in to the new home, the parties' relationship soon soured and deteriorated for various reasons now in dispute. The marital deterioration ultimately resulted in a temporary ejection of Father from the new home in late September pursuant to a later dismissed protective order petition, Father denying Surrogate access to the child, and Surrogate's filing for divorce in October 2020. *Inter alia*, her dissolution petition prayed for interim and final parenting plans placing the then 9-month-old child in her primary residential custody, and distribution of the marital estate in accordance with their premarital agreement and § 40-4-202, MCA, as respectively applicable.

¶9 Following an initial *pro se* response disputing Surrogate's parental rights and resulting child custody claims, *inter alia*, Father counter-petitioned through newly-retained counsel for invalidation of the marriage based on alleged fraudulent inducement. On August 20, 2021, following evidentiary hearing on various preliminary motions (including Father's motion to dismiss Surrogate's parenting plan claim and her motion counterclaim "for parental rights" regarding the child), the District Court found and concluded that: (1) Father was sufficiently fluent in English to read and understand the meaning and consequences of the parties' premarital agreement; (2) the agreement was valid and enforceable pursuant to its terms; (3) the parties' non-traditional marriage was uncommon but nonetheless valid and untainted by fraud; (4) "a parent-child relationship exists" between Surrogate and the subject child as defined by § 40-4-211(6), MCA, based on the parent-child relationship declaration in their premarital agreement and her subsequent

involvement and relationship with the child; and (5) Surrogate thus had legal "standing" "to establish a parenting plan" for the child "pursuant to" § 40-4-211(4)(b), MCA.

¶10 Upon subsequent bench trial, the District Court issued additional findings of fact, conclusions of law, and a final decree in February 2022 dissolving the parties' marriage, apportioning their separate and marital estate property in accordance with their premarital agreement and § 40-4-202, MCA, as applicable, and imposing a parenting plan pursuant to §§ 40-4-212, -233, and -234, MCA, which placed the child in the primary residential custody and care of Surrogate with lesser specified time with Father. Father timely appeals the District Court's judgments to the extent that they adjudicated nonparent parental rights, and a resulting parenting plan, in favor of Surrogate.

**STANDARD OF REVIEW**

¶11 We review lower court conclusions and applications of law, including the interpretation and application of statutes, de novo for correctness. *In re Parenting of S.J.H.*, 2014 MT 40, ¶ 8, 374 Mont. 31, 318 P.3d 1021; *In re A.P.P.*, 2011 MT 50, ¶ 7, 359 Mont. 386, 251 P.3d 127; *Kulstad v. Maniaci*, 2009 MT 326, ¶ 50, 352 Mont. 513, 220 P.3d 595; *Wilkes v. Est. of Wilkes*, 2001 MT 118, ¶ 10, 305 Mont. 335, 27 P.3d 433; *In re Marriage of Stout*, 261 Mont. 10, 13, 861 P.2d 856, 857 (1993); *In re Marriage of Shirilla*, 2004 MT 28, ¶ 8, 319 Mont. 385, 89 P.3d 1. The construction or interpretation of the meaning or effect of a written contract or contract provision is likewise a question of law reviewed de novo for correctness. *Eschenbacher v. Anderson*, 2001 MT 206, ¶ 21, 306 Mont. 321, 34 P.3d 87. In contrast, we review lower court findings of fact, including those pertinent to

10

the validity of a premarital agreement, only for clear error. *Wilkes*, ¶ 10; *Kulstad*, ¶ 51. A lower court finding of fact is clearly erroneous only if not supported by substantial evidence, the lower court clearly misapprehended the effect of the evidence, or, upon our independent review of the record, we are definitely and firmly convinced that the court was otherwise mistaken. *Ragland v. Sheehan*, 256 Mont. 322, 326, 846 P.2d 1000, 1003 (1993). The threshold question of whether a party had legal standing to assert a particular claim for relief is a question of law subject to de novo review. *In re N.P.M.*, 2020 MT 33, ¶ 7, 399 Mont. 1, 457 P.3d 962 (citing *Chipman v. Northwest Healthcare Corp.*, 2012 MT 242, ¶ 16, 366 Mont. 450, 288 P.3d 193).

**DISCUSSION**

¶12    1.  *Whether the District Court erroneously concluded that the California GCA did not preclude subsequent Surrogate establishment of a parental interest/right under Montana law?*

¶13    Father and Surrogate entered into and signed the GCA in accordance with California Family Code §§ 7960-62, a statutory scheme providing for, defining, and specifying the requisite procedural and substantive requirements for the creation and enforceability of "assisted reproduction agreements" between intended parents and a surrogate gestational carrier of a human embryo. Cal. Fam. Code § 7962 (2020). The manifest purpose of Cal. Fam. Code §§ 7960-62 is to provide "intended parents, surrogates, and courts" with "a clear procedure to follow in creating and enforcing [gestational] surrogacy agreements and determining [resulting] parental rights." *C.M. v. M.C.*, 213 Cal. Rptr. 3d 351, 363 (Cal. Ct. App. 2017) (citation omitted). *See also Johnson v. Calvert*, 851 P.2d 776, 783-87 (Cal.

11

1993) (statutorily-authorized gestational carrier agreement disclaimer/waiver of parental rights/claims not violative of public policy or federal constitutional equal protection, substantive due process, or implied privacy rights of nonparent surrogate gestational carrier).

¶14 As a preliminary matter here, neither the validity nor enforceability of the subject GCA is at issue on appeal, whether as a matter of common law contract formation, lawful object, clarity, completeness, or compliance with the pertinent provisions of Cal. Fam. Code §§ 7960-62. The GCA is thus an express written contract limited to its clear and unambiguous terms. *See* §§ 28-2-103, -905(1), 28-3-301, -303, -305, and -401, MCA (express contracts, contracts must be construed to effect ascertainable mutual intent of parties at time of contracting, and written contracts generally governed by their "clear and explicit" express language); *accord* Cal. Civ. Code §§ 1620, 1636, 1638, 1639, and 1648.

¶15 As manifest in its clear and unambiguous language, the purpose and object of the GCA was, in return for specified consideration, for Surrogate to successfully carry the implanted fertilized embryo to birth, fully cooperate in an uncontested adjudication of Father as the sole legal parent and custodian of the child, and then physically surrender and relinquish the newborn to Father on birth without any acquired or residual claim or assertion of parental right based on the fact that she was the surrogate birth mother to the child. *See* GCA Recitals A, C-G, and §§ 1.2, 3.1 through 3.5, and 14. Further buttressing this plain language interpretation, the governing California gestational surrogacy agreement statute from and to which the GCA derived and comports unambiguously

12

provides that the resulting uncontested confirmatory "judgment or order shall establish the parent[-]child relationship of the intended parent . . . and shall *establish that* the *surrogate* . . . is *not a parent* of, *and has no parental rights* or duties with respect to, the child." Cal. Fam. Code § 7962(f)(2) (emphasis added). *See also C.M.*, 213 Cal. Rptr. 3d at 362 (noting that "[c]ompliance with the requirements of an assisted reproduction agreement" as specified by Cal. Fam. Code § 7962 "is *all that is necessary* to establish a parent-child relationship for the intended parent or parents and *to extinguish any claim of parenthood by the surrogate*"—emphasis added); *Johnson*, 851 P.2d at 783-87 (noting that a § 7962-compliant gestational surrogacy agreement overcomes and precludes legal presumption and any resulting claim that surrogate birth mother is a legal parent of a child). Nothing in the plain language of GCA §§ 3.1 or 3.2, or enabling Cal. Fam. Code § 7962, evinces any contract or enabling legislative provision or intent to provide for or accomplish anything more than the surrogate's post-birth relinquishment and surrender of the newborn child to the intended parent, completely free and clear of any claim of parental right by or from the surrogate, whether based on the fact that she was the actual birth mother or any pre-relinquishment contact with the child. Thus, nothing express or manifestly implicit from the express language of the GCA precluded Surrogate from later-acquiring a parental interest or right in the child by other legal means based on predicate facts that might later occur independent of the fact that Surrogate was the surrogate birth mother of the child.

¶16     "An executed contract is one the object of which is fully performed." Section 28-2-104, MCA (adopted from Cal. Civ. Code § 1661); Cal. Civ. Code § 1661 (adopted

13

from draft Field Civ. Code of N.Y. § 826 (1865)). A party's "[f]ull performance" of a contract obligation or duty "extinguishes" the subject contract obligation or duty. Section 28-1-1101, MCA (adopted from Cal. Civ. Code § 1473); Cal. Civ. Code § 1473 (adopted from draft Field Civ. Code of N.Y. § 699 (1865)). On the pertinent factual record here, it is beyond genuine material dispute that, upon or incident to discharge from the hospital after the birth of the child, Surrogate immediately and unconditionally surrendered and relinquished physical custody of the child to Father without any assertion or claim of residual or acquired parental right or relationship. At that point, the central object of the GCA was accomplished by strict performance in accordance with its pertinent terms in §§ 1.2, 3.1, 3.2, and 3.3, and the resulting California judgment confirming Father as the sole legal parent and custodian of the child, and extinguishing and precluding any residual post-birth claim of parental right of or by Surrogate.[5] Thus, as a matter of Montana and identical California law, the GCA terminated by its terms on Surrogate's relinquishment of the child upon discharge from the hospital, in accordance with the GCA-provided California judgment adjudicating the parties' respective rights regarding the child.

¶17 As manifest in the District Court's findings of fact, and underlying evidentiary record, it is further beyond genuine material dispute that: (1) Father accepted Surrogate's post-relinquishment offer for transportation from the hospital to his temporary rental home; (2) he also accepted her subsequent offer to let them temporarily stay with her until he

---

[5] The parties do not dispute that the California GCA was valid, enforceable by its terms, and fully performed in all pertinent regards. Nor is there any record indication to the contrary.

14

found better local accommodations; (3) he and the child accordingly began staying with Surrogate in her home where she helped care for the baby; and (4) less than two weeks later, she proposed for Father's consideration what she believed would be a mutually beneficial platonic marriage based on her concern and developing bond with the child and her to desire help Father with matters of pressing concern to him (i.e., adequate infant care, continued pursuit of an American college degree in business, and acquisition of green card eligibility entitling him to permanently stay in the United States). Surrogate's subsequently asserted claim of parental interest or right was and is thus *not* based on the fact that she was the actual surrogate birth mother of the child, as precluded by the GCA and resulting California judgment. Rather, her subsequently asserted claim of parental interest or right was and is based on factual developments that did not occur until well after the GCA terminated by its terms. Consequently, as a matter of law, the limited terms of the by-then fully performed and terminated GCA simply did not apply to Surrogate's subsequently asserted claim of parental interest or right in this case.

¶18 However, based on the parties' apparent assumption that the terms of the prior GCA precluded Surrogate from *later* acquiring a parental interest in the child by legal means not dependent on the fact that she was his surrogate birth mother, the District Court did not question that erroneous assumption, and instead focused on their competing assertions as to whether their subsequent Montana premarital agreement effected an amendment of the otherwise preclusive terms of the California GCA. Upon consideration of the parties' competing arguments, the court agreed with Surrogate that the parental interest declaration

15

in the subsequent premarital agreement thus amended and superseded the seemingly contrary terms of the GCA, thereby eliminating it as an impediment to her subsequently asserted claim of parental interest or right in the child. However, as manifest in the foregoing analysis, the court's conclusion was based on a fundamentally erroneous conclusion of law overlooking the limited terms and reach of the GCA upon the parties' full performance under those limited terms. While we thus cannot endorse the District Court's stated rationale, we will nonetheless affirm a correct result even if based on incorrect reasoning. *See, e.g.*, *In re Parenting of J.N.P.*, 2001 MT 120, ¶ 24, 305 Mont. 351, 27 P.3d 953. Regardless of the erroneous rationale put before the court by the parties, we hold at bottom that the District Court correctly concluded that the preclusive terms of the GCA did not preclude Surrogate from later acquiring or establishing a parental interest and right to the extent independently authorized under Montana law.

¶19    2. *Whether the District Court erroneously failed to conclude that the parent-child relationship provision of the parties' subsequent Montana premarital agreement was unenforceable due to lack of voluntary consent of Father?*

¶20    The Montana Uniform Premarital Agreement Act expressly authorizes written "premarital agreements," regarding a specified scope of matters, "between prospective spouses . . . in contemplation of," and "effective upon," the ensuing marriage. Sections 40-2-603(1), -605, and -606, MCA. It authorizes prospective marital parties to "contract" regarding, *inter alia*, the status and disposition of their premarital property and assets, and later-acquired property and assets, which would otherwise be subject to equitable division as part of the marital estate in the event of a future invalidation of the marriage, legal

16

separation, or marital dissolution. Section 40-2-605(1)(a)-(f), MCA; *compare* § 40-4-202(1), MCA (equitable division of all "property and assets belonging to either or both, however and whenever acquired," regardless of title, upon declaration of invalidity, legal separation, or dissolution). As particularly pertinent here, the Act further allows prospective marital parties to "contract" regarding "any other matter, including their personal rights and obligations, not in violation of public policy." Section 40-2-605(1)(h), MCA. Except as contrary to "public policy," the Act thus authorizes prospective marital parties to contract regarding a wide scope of matters including, *inter alia*, "the upbringing of children." Section 40-2-605, MCA, Commissioners' Note (1987). While premarital agreements were previously more or less variously cognizable under the common law in many states, the purpose of the Act was to eliminate the "problems caused by" the "uncertainty" of enforcement and "nonuniformity" of such "agreements among the states" through "uniform legislation conforming to modern social policy." Title 40, chapter 2, part 6, MCA, Commissioners' Note (1987).

¶21 Subject to various statutorily specified formalities, attributes, and limitations, an Act-authorized premarital agreement is a special type of contract subject to generally applicable contract principles. *See* § 40-2-608, MCA (enforceability); § 40-2-605, MCA (authorizing prospective marital parties to "contract" regarding various matters); § 40-2-608, MCA, Commissioners' Note (1987) (noting that "a premarital agreement is a contract" generally subject to generally applicable requirements for contract formation); *Wilkes*, ¶¶ 12-16 (applying generally applicable contract formation principles to a statutory

premarital agreement); *Wiley v. Iverson*, 1999 MT 214, ¶¶ 20-21, 295 Mont. 511, 985 P.2d 1176 ("antenuptial agreements" are generally "valid and enforceable between two consenting parties . . . if the agreement[s] meet[] the requirements of a contract" and thus remain subject to the "same scrutiny as any other contract"). Apart from validity and enforceability issues under generally applicable contract principles, the Act expressly provides in pertinent part that an otherwise valid premarital agreement is "not enforceable" against a party who "proves" that he or she "did not execute the agreement voluntarily." Section 40-2-608(1)(a), MCA. *See similarly* §§ 28-2-102(2), -301, -303, and -401, MCA (contract consent/mutual assent requirement and when apparent consent not free). A signed written contract or agreement, including a statutory premarital agreement, may be similarly invalid or unenforceable under generally applicable contract principles based, *inter alia*, on lack of mutual assent, lack of capacity to contract, fraud, duress, undue influence, or mutual mistake. *See* §§ 28-2-102, -201, -202, -301, -303, and -401, MCA; *Shirilla*, ¶¶ 12-13 (premarital agreement "involuntary" as referenced in § 40-2-608(1)(a), MCA, if subject lacked "capacity" or was subject to "duress, fraud, [or] undue influence" "factors uniquely probative of coercion in the premarital context"—citation omitted); *Wilkes*, ¶¶ 12-16 (applying generally applicable contract formation principles to statutory premarital agreement); *Wiley*, ¶¶ 20-26 (applying generally applicable contract principles to statutory premarital agreement); § 40-2-608, MCA, Commissioners' Note (1987) (Act includes "[n]o special provision . . . for enforcement of" premarital agreements "relating to personal rights and obligations" because a "premarital agreement is a contract and these

18

provisions may be enforced to the extent . . . enforceable . . . under otherwise applicable law"). In any event, the party challenging the validity or enforceability of the express terms of a signed written contract, including a statutory premarital agreement, has the burden of proving the asserted factual basis of the alleged invalidity or unenforceability. *See* §§ 26-1-401, -402, 28-2-805, and 40-2-608(1)(a), MCA; *Shirilla*, ¶ 13; *Berry v. Mann*, 188 Mont. 71, 75, 610 P.2d 1180, 1182 (1980).

¶22 Here, Father asserts, *inter alia*, that the parties' premarital agreement is unenforceable pursuant to § 40-2-608(1)(a), MCA, because he did not voluntarily sign it due to: (1) inadequate understanding of the English language; (2) lack of assistance of counsel; (3) circumstantial duress resulting from his lack of English language proficiency, his young age, lack of "substantial professional and social supports [as] he had enjoyed in Auburn," isolation from his Chinese family, and belief that "he and his newborn baby might be forced to return to China" "if he did not marry [Surrogate]"; and/or (4) Surrogate's substantial "undue influence" including the fact that she "effectively" represented "that signing a premarital agreement was necessary in order to get married." However, Father's creative briefing characterization aside, "*effectively*" representing that a premarital agreement "was necessary in order to get married," is not an actual representation to that effect. There is no evidence that Surrogate either expressly represented, or manifestly implied or insinuated, to Father that a premarital agreement was a necessary legal prerequisite to marriage.

19

¶23 Moreover, "[a] party who executes a written contract is presumed to have read and understood" the clear and unambiguous language of its express terms. *Lenz v. FSC Secs. Corp.*, 2018 MT 67, ¶ 22, 391 Mont. 84, 414 P.3d 1262. "Absent incapacity, mutual mistake, fraud, misrepresentation, or other tortious conduct affecting assent, ignorance or disregard of clear and unambiguous contract language is not a ground for relief" from enforcement of the agreement. *Lenz*, ¶ 22 (citation and internal punctuation omitted). A capable "party to a clear and unambiguous written contract cannot avoid its legal consequences simply by later claiming that [he or] she did not understand the legal consequences of [its] plain language." *Lenz*, ¶ 22 (citation and internal punctuation omitted). In other words:

> [a] party to a contract cannot avoid the contract on the ground that he made a mistake where there has been no misrepresentation, no ambiguity in the terms of the contract and the other party has no notice of such mistake and acts in good faith. . . . [E]ven if one of the contracting parties believes the words of the contract mean something different, the parties . . . are bound by the plain meaning of the . . . the agreement as properly interpreted, unless the other party knows of such mistake.
>
> One who executes a written contract is presumed to know the contents of the contract and to assent to those specified terms, in the absence of fraud, misrepresentation, or other wrongful act by the other contracting party. Absent incapacity to contract, ignorance of the contents of a written contract is not a ground for relief from liability.
>
> If a contracting party acts negligently and in such a manner as to lead [another] to suppose that the writing is assented to by him, the contracting party will be bound in law and in equity, even though the contracting party supposes the writing is an instrument of an entirely different character. The integrity of written contracts would be destroyed if contracting parties, having admitted signing the instrument, were allowed to rescind the contract on the basis they neither read nor understood the expressed agreement.

20

*Quinn v. Briggs*, 172 Mont. 468, 475-76, 565 P.2d 297, 301 (1977) (internal citations omitted).

¶24    In this case, the language of the disputed premarital agreement is manifestly plain, clear, and unambiguous.  The District Court found that Father was sufficiently fluent in the English language to read and understand its clear and unambiguous language as evidenced by his enrollment and participation in "college level courses at Auburn University" in pursuit of "a bachelor's degree in Business Administration."  The court found that he received a copy of the proposed agreement seven days before the scheduled civil marriage ceremony, and thus had ample opportunity to read, review, and understand it.  The court further noted that Surrogate had previously advised Father that "she was having her attorney draft a premarital agreement and that he should have his own lawyer review [it]" before signing.  The plain language of the agreement similarly stated clearly and unambiguously that:  (1) each party individually had the opportunity to consult with independent counsel regarding the agreement, if so inclined; (2) "each has read th[e] agreement and/or may have had its contents explained to him or her by counsel"; and (3) "each fully understands [its] terms, provisions, and legal consequences."

¶25    The District Court's findings of fact indicate that both parties contemporaneously believed that the terms of the agreement formalized the essence of the mutually beneficial arrangement that they had discussed with the best of intentions over a period of several weeks before Father received the draft agreement for review.  Surrogate gave unrebutted testimony that she wanted to have a premarital agreement because she "wanted parental

21

rights" to the child "in case something [later] happened to" Father, particularly in light of his HIV-positive health status. The court's pertinent findings and underlying evidence indicate that neither Surrogate's suggestion and presentation of the draft premarital agreement, nor any of its terms, were *contemporaneously* surprising, confusing, objectionable, or disconcerting to Father. The court specifically found that Father's subsequent contrary testimonial assertions (that he did not understand the consequences of the agreement due to lack of English proficiency and had insufficient time to review and understand the agreement) were not credible under the circumstances. Except for his own self-serving testimonial assertions several months later in wake of acrimonious deterioration of the parties' relationship (including, *inter alia*, as characterized on appeal that Surrogate "effectively" misrepresented that a premarital agreement was a necessary legal prerequisite for marriage), there is no evidence that she pressured or coerced him to sign the agreement, or that he had any *contemporaneous* misunderstanding, reservation, reluctance, concern, or objection regarding any of its terms. Trial courts have broad discretion to determine the relative veracity, credibility, and weight of conflicting evidence, and we must defer to such determinations absent showing that a material finding of fact is clearly erroneous. *In re Marriage of Bliss*, 2016 MT 51, ¶¶ 15-21, 382 Mont. 370, 367 P.3d 395. Here, the District Court's pertinent findings of fact are supported by substantial record evidence, and our review of the record indicates that the court neither misapprehended the evidence, nor was otherwise mistaken.

¶26    The District Court's supported findings of fact thus preclude Father's cursory assertions on appeal that the parties' marriage and/or their related premarital agreement were the product(s) of Surrogate's undue influence. *See* § 28-2-407, MCA (narrowly defining "undue influence" as: "(1) the use by one in whom a confidence is reposed by another person or who holds a real or apparent authority over [him] of [such] confidence or authority for the purpose of obtaining an unfair advantage over [him]; (2) taking an unfair advantage of another['s] weakness of mind; or (3) taking a grossly oppressive and unfair advantage of another['s] necessities or distress"); *In re Est. of Bradshaw*, 2001 MT 92, ¶¶ 13 and 16, 305 Mont. 178, 24 P.3d 211 (non-exclusive indicia of common law undue influence—"confidential relationship" between the subject parties, physical or mental condition affecting subject's "ability to withstand influence," resulting "unnatural[]" disposition/conduct manifesting an "unbalanced" or "easily susceptible" mindset, and/or "demands and importunities" affecting the subject under the totality of the circumstances); Restatement (Second) of Contracts § 177 (Am. Law Inst. 1981) (defining undue influence as "unfair persuasion of a party who is under the domination of the person exercising the persuasion"). The court's findings similarly preclude Father's cursory assertions on appeal that the parties' marriage and/or underlying premarital agreement were the product(s) of circumstantial "duress." *See* § 28-2-402, MCA (defining "duress" as conduct or decisions resulting from "unlawful confinement" of the subject, "unlawful detention" of the subject's property, or lawful confinement of subject "fraudulently obtained" or "fraudulently made unjustly harassing or oppressive"); Restatement (Second) of Contracts § 174 (defining

"duress" as "assent . . . physically compelled" by another regarding a matter to which subject not otherwise inclined); Restatement (Second) of Contracts § 175 (defining "duress" as assent compelled by "an improper threat . . . leav[ing]" subject with "no reasonable alternative"). *See also Hoven v. First Bank (N.A.)*, 244 Mont. 229, 234-35, 797 P.2d 915, 919 (1990) ("economic duress" requires proof of "wrongful act," "overcom[ing] the will" of a subject, "who has no adequate legal remedy to protect [own] interests"—"circumstances evincing [subject's] lack of free will" requires more than that consent was the product of "the pressure of financial circumstances"); *Avco Fin. Servs. v. Foreman-Donovan*, 237 Mont. 260, 264, 772 P.2d 862, 864 (1989) (consent not the product of duress where subject was "constrained to enter into a transaction . . . by force of circumstances for which the other party is not responsible"—citation omitted). While Father clearly found himself in difficult circumstances as a result of his mother's unanticipated inability to join him in this country to help care for the new baby as originally planned, there is no evidence, or even assertion, that Surrogate was in any way responsible for that difficulty. The District Court made express findings, moreover, to the effect that, prior to the subsequent deterioration of their relationship after they moved into a new home with Father's boyfriend, Surrogate fully intended to, and did in fact, as mutually agreed, help Father co-parent the child, assist in his efforts to "obtain a green card so he could remain in the United States," arrange for him to have spousal health insurance coverage, and help him obtain a Montana identification card to aid in his college admission in Billings. The court's findings are supported by substantial evidence, and our review of the

24

record indicates no basis upon which to conclude that it either misapprehended the effect of the evidence or was otherwise mistaken. Under these circumstances, the facts that Surrogate suggested or proposed the terms of their marriage and related premarital agreement, that Father did not seek the advice of counsel before signing the agreement and proceeding with the marriage, and that the parties' relationship later deteriorated are insufficient without more to render his contemporaneous consent to the agreement and marriage to be the products of duress or undue influence as those terms are narrowly defined by law.

¶27 Contrary to Father's assertion, the facts of this case are thus distinguishable from those at issue in *Shirilla*, ¶¶ 3-7 and 15-16 (invalidating as involuntary twice previously rejected premarital agreement and ensuing marriage resulting from "internet romance" between Montana physician and non-English proficient Russian woman through "Russian dating service" who signed under duress of imminent expiration of her "fiancée visa"). We hold that the District Court correctly found and concluded that Father voluntarily signed the premarital agreement and that it was thus a validly formed and enforceable contract.[6]

¶28    3.  *Whether the District Court erroneously failed to find and conclude that the parent-child relationship provision of the parties' Montana premarital agreement was equitably unconscionable?*

---

[6] Based on the District Court's finding of an established "child-parent relationship" based on the parent-child relationship provision of the parties' premarital agreement *and* the relationship that *later* developed between Surrogate and the child, and our subsequent analysis of Surrogate's nonparent "parental interest" claim under § 40-4-228(1)-(2), MCA, *infra*, we need not address the issue of whether the premarital agreement parent-child relationship provision was void or voidable due to violation of public policy in contravention of § 40-4-228(2)(a), MCA (requiring parent conduct "contrary to the child-parent relationship" as an essential element of proof, *inter alia*, of a nonparent "parental interest" claim).

¶29 A contract or included provision that is otherwise valid and enforceable at law may yet be unenforceable if equitably unconscionable. *Bucy v. Edward Jones & Co., L.P.*, 2019 MT 173, ¶ 38, 396 Mont. 408, 445 P.3d 812 (citing *Lenz*, ¶ 26). A contract or included provision is equitably unconscionable if it is both one of adhesion and "unreasonably favors the stronger party or is unduly oppressive to the weaker party." *Lenz*, ¶¶ 25-26.[7] A contract or included term is one of adhesion only if dictated by a party in a superior bargaining position to a weaker party, "on a take it or leave it basis[,] without any reasonable opportunity for negotiation." *Lenz*, ¶ 26. Whether a contract or included provision is unconscionable is a "mixed question of fact and law under the totality of circumstances surrounding the execution of the contract." *Lenz*, ¶ 31.[8] The party asserting that an otherwise validly formed contract or included provision is equitably unconscionable has

---

[7] *See similarly Kelly v. Widner*, 236 Mont. 523, 528, 771 P.2d 142, 145 (1989) (indicia of equitable unconscionability include "unequal bargaining power, lack of meaningful choice, oppression, and exploitation of the weaker party's vulnerability or lack of sophistication"). *Compare* § 40-2-608(1)(b), MCA (supplemental statutory ground for invalidation of a financial or property provision of statutory premarital agreement when subject provision is both equitably unconscionable *and* subject "was not provided a fair and reasonable disclosure of the property or financial obligations of the other party" under certain specified circumstances). The "standard of unconscionability" referenced in § 40-2-608(1), MCA, is the same as "used in commercial law, where its meaning includes protection against one-sidedness, oppression, or unfair surprise"— § 40-2-608, MCA, "does not introduce a novel standard unknown to the law." Section 40-2-608, MCA, Commissioners' Note (1987). *But see Wilkes*, ¶ 23 ("[t]here [is] no set definition of unconscionability" under § 40-2-608, MCA—quoting *In re Marriage of Pearson*, 1998 MT 236, ¶ 30, 291 Mont. 101, 965 P.2d 268). Our cursory statement in *Wilkes* that § 40-2-608, MCA, imposes an indefinite standard of unconscionability inconsistently overlooks the explanatory Commissioners' Note to § 40-2-608, MCA, and the related point of law, *supra*, that statutory premarital agreements are contracts generally subject to generally applicable contract principles.

[8] *See similarly* § 40-2-608(3), MCA ("[a]n issue of unconscionability of a premarital agreement" under § 40-2-608(1)(b), MCA, "must be decided by the court as a matter of law").

26

the burden of proving the asserted factual basis of the alleged invalidity or unenforceability. *See* §§ 26-1-401, -402, and 28-2-805, MCA; *Berry*, 188 Mont. at 75, 610 P.2d at 1182.

¶30    Here, as manifest in the foregoing contract formation analysis, the parties were not in disparate bargaining positions. There is no evidence indicating that Father had no other alternative child care option, whether in Billings or upon return to Auburn, Alabama, or that he would have been unable to continue to lawfully stay in the United States under his prior student visa for an extended period of time as originally planned. The court found that Father read and was capable of understanding all terms of the agreement, voluntarily signed it, and had ample opportunity to consult with independent counsel before doing so. There is no evidence that he had any *contemporaneous* objection, reservation, or concern before signing it. The court's findings reflect that, despite Father's later self-serving assertions to the contrary, the parent-child relationship provision reflected the mutual contemporaneous intent and desire of the parties at the time of signing, free of any subsequently asserted undue influence or duress as those terms are narrowly defined by law. There is no evidence that Surrogate contemporaneously dictated the parent-child relationship provision on a take it or leave it basis. The mere facts that Surrogate suggested or proposed it as an included term of the agreement, and that Father chose to accept it and proceed with the proposed marriage rather than returning with the child to college in Alabama as originally planned, are insufficient without more to render it a term of adhesion.

¶31 As further similarly manifest in the foregoing contract formation analysis, both parties contemporaneously believed that the terms of the agreement formalized the essence of the mutually beneficial arrangement that they had previously discussed in detail with the best of intentions over a period of several weeks. Nothing under the contemporaneous circumstances, and mutual understanding and intent of the parties, at the time of execution of the agreement or their subsequent marriage indicates that the parent-child relationship provision of the agreement was objectively unreasonable, one-sided, unfair, or oppressive to Father, even in the event of a then-unanticipated future deterioration of their non-traditional relationship and resulting dissolution of marriage. We hold that the District Court did not erroneously reject Father's assertion that the parent-child relationship provision was unenforceable as equitably unconscionable.

¶32 4. *Whether the District Court erroneously concluded that the parties' post-surrogacy premarital agreement and Surrogate's ensuing relationship with the child were sufficient to create a third-party parental right regarding the child?*

¶33 As matters of substantive due process, equal protection, and retained personal rights under the Fourteenth and Ninth Amendments to the United States Constitution, the legal parents of a child have an implicit fundamental constitutional right to the custody, care, rearing, companionship, and to determine the best interests of their child or children vis-à-vis nonparent third parties including state governments under state law. *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 2059-60 (2000) (plurality); *Stanley v. Illinois*, 405 U.S. 645, 651-52, 92 S. Ct. 1208, 1212-13 (1972) (citing U.S. Const. amends. XIV and IX); *Girard v. Williams*, 1998 MT 231, ¶ 16, 291 Mont. 49, 966 P.2d 1155;

28

*Babcock v. Wonnacott*, 268 Mont. 149, 152, 885 P.2d 522, 524 (1994); *In re Guardianship of Aschenbrenner*, 182 Mont. 540, 544-45, 597 P.2d 1156, 1160 (1979); *In re Guardianship of Doney*, 174 Mont. 282, 286, 570 P.2d 575, 577 (1977). *Accord In re A.R.A.*, 277 Mont. 66, 70-71, 919 P.2d 388, 391 (1996) (recognizing that the right to parent one's child also reciprocally includes the child's fundamental right "to be with his or her . . . parent"). Underlying a parent's fundamental constitutional right to parent his or her child is the rebuttable presumption that a parent will adequately care for his or her child and act in the child's best interests. *See Troxel*, 530 U.S. at 68-70, 120 S. Ct. at 2061-62 (citing *Parham v. J. R.*, 442 U.S. 584, 602, 99 S. Ct. 2493, 2504 (1979) (recognizing historical presumption that "natural bonds of affection lead parents to act in the best interests of their children")). As a matter of law, a parent's fundamental federal constitutional right to parent his or her child thus "prevails over" any nonparent's claim of parental or custodial interest or right regarding the child absent adjudication that the parent "has forfeited" the exclusivity of that right to an applicable degree under applicable state law conforming to constitutional limits. *See Girard*, ¶ 16 (citations omitted).[9] *See also Troxel*, 530 U.S. at 73-74, 120 S. Ct. at 2064 ("sweeping breadth" of solely best-interests-based Washington nonparent visitation statute unconstitutional as-applied—thus not addressing whether substantive due process may require a "per se" "showing of harm or potential harm" to child "as a condition

---

[9] The level or standard of constitutional scrutiny applicable to state law infringement of fundamental parental rights is not at issue in this case.

precedent to" recognition of a nonparent custody or visitation right).[10] *See similarly Troxel*, 530 U.S. at 78, 120 S. Ct. at 2066-67 (Souter, J., concurring) (Supreme Court has "not set out exact metes and bounds" of the protected parent-child relationship, but parental "right of upbringing would be a sham" if parent not "free of judicially compelled [nonparent] visitation" simply because a nonparent "could make a better decision" than the parent—internal punctuation omitted).

¶34 Beyond recognition that a wide-ranging best interests standard is insufficient alone, the United States Supreme Court has yet to recognize a generally applicable legal standard defining whether or to what extent parental conduct is sufficiently contrary to the parent-child relationship to justify forfeiture or other third-party infringement of parental rights short of adjudicated parental unfitness, and thus termination of parental rights or recognition of nonparent custody and visitation rights *in conjunction with* the best interests of the child. *See Troxel*, 530 U.S. at 73-74, 120 S. Ct. at 2064, *supra*; *Troxel*, 530 U.S. at 78, 120 S. Ct. at 2066-67 (Souter, J., concurring), *supra*; *Troxel*, 530 U.S. at 85-86 and 89, 120 S. Ct. at 2070-71 and 2072 (Stevens, J., dissenting) (substantive due process protects "parent-child relationship from arbitrary [state] impairment" but no Supreme Court precedent supports a per se requirement for "a showing of actual or potential 'harm' to the child" as prerequisite to nonparent visitation rights—Court has "never held that the parent's

---

[10] We have similarly narrowly held that a state law "best interests of the child" standard is an insufficient basis alone upon which to override or interfere with a parent's fundamental right to parent. *See In re Parenting of J.N.P.*, 2001 MT 120, ¶ 26, 305 Mont. 351, 27 P.3d 953; *In re Doney,* 174 Mont. at 286-87, 570 P.2d at 578; *Henderson v. Henderson*, 174 Mont. 1, 8-10, 568 P.2d 177, 181-82 (1977).

liberty interest . . . establish[es] a rigid constitutional shield[] protecting every arbitrary parental decision from any challenge absent a threshold finding of harm"—protection of parental rights against arbitrary state interference should not preclude "States from protecting children against the arbitrary exercise of parental authority . . . [not] motivated by an interest in the welfare of the child").

¶35  In the absence of a bright line federal constitutional standard for nonparent infringement of parental rights, the Legislature has set forth a number of distinct statutory schemes and criteria for judicial termination of parental rights and/or recognition of nonparent custody and visitation rights under Montana law.[11]  Even when the facial or

---

[11] Title 41, chapter 3, MCA (temporary protective custody and termination of parental rights based on adjudicated child abuse or neglect); Title 42, chapter 2, parts 3, 4, and 6, and chapter 4, MCA (termination of parental rights incident to nonparent adoption of child based on voluntary relinquishment or adjudicated paternity denial, waiver of parental right, or unfitness); Title 40, chapter 6, part 1, MCA (Uniform Parentage Act claims for adjudication of nonexistent father-child relationship between subject child and presumptive/putative father); Title 40, chapter 6, part 6, MCA (nonparent "caretaker" claims for adjudication of apparent parental abandonment and continued caretaker custody pending independent proceedings for termination or infringement of parental rights); Title 40, chapter 6, part 10, MCA (claims for termination of parental rights based on unlawful sexual intercourse, sexual assault, or incest inflicted on child by parent); § 40-4-221, MCA (parent and nonparent claims for custody/parenting plan upon death of parent); §§ 40-4-227 and -228, MCA (nonparent claims for "parental interest in a child" upon findings of establishment of specified "child-parent relationship," "natural parent" conduct "contrary to the child-parent relationship," and nonparent parental interest in "best interests of the child"); Title 40, chapter 9, MCA (claims for adjudication of grandparent "right to contact with child" in "best interests of the child" and on finding either that objecting parent is "unfit" or, if "fit," claimant has "rebutted" "the presumption in favor of the parent's wishes").  *Compare* §§ 40-4-212, -213, -217, -218 through -220, -233, and -234, MCA (Uniform Marriage and Divorce Act (UMDA) child custody/parenting plan determinations between parents on marital invalidity, dissolution, or separation); Title 72, chapter 5, part 2, MCA (nonparent claims for guardianship of minor "if all parental rights of custody have been terminated or if parental rights have been suspended or limited by circumstances or prior court order," and guardianship "will serve" the child's "welfare and best interests").

as-applied constitutionality of these various statutory schemes is not at issue, we have long

recognized that:

> District [c]ourts must identify and adhere to the proper procedure and standards to be used in the proceedings before them. Only then will the fundamental rights and [existing parent-child relationship] be fully realized or, when necessary, properly severed [or infringed]. . . . [District courts must make and adhere to a threshold] determination of the precise nature of the . . . [applicable statutory framework for the proceeding at issue]. The criteria used in resolving whether, under given circumstances, a nonparent has standing to request custody of a child in opposition to an [existing] parent varies depending on the nature of the [particular statutory child custody framework at issue]. As a result, the proper analysis of a standing issue vis-a-vis a request for custody requires an initial determination of the precise nature of the [statutory nonparent claim at issue].

*Girard*, ¶ 24 (citing *Aschenbrenner*, 182 Mont. at 552-53, 597 P.2d at 1164).

> [W]hile there is some overlap in these various [statutory schemes] as to general subject matter, *each is used for a distinct purpose and sets forth specific procedures which must be followed* before a valid judgment or order may be issued. To insure that the minors involved received the full protection of these laws, these procedures should be rigorously followed.

*Aschenbrenner*, 182 Mont. at 553, 597 P.2d at 1164 (emphasis added—internal

punctuation omitted). We have thus required district courts and parties to adhere to the

applicable statutory scheme without conflation with others, and in accordance with the

then-existing custodial rights of a parent vis-à-vis a nonparent claimant. *See A.R.A.*, 277

Mont. at 70-72, 919 P.2d at 391-92 (§ 40-4-221, MCA (authorizing parent and nonparent

claims for custody/parenting plan upon death of custodial parent in best interests of the

child), does not authorize grant of custody to nonparent step-parent over surviving

non-custodial parent based on mere best interests standard); *Aschenbrenner*, 182 Mont. at

545-53, 597 P.2d at 1160-64 (reversing termination of parental rights and accompanying

grant of guardianship to nonparent paternal grandparents (parents of mother's ex-husband) in guardianship proceeding based on asserted abandonment by mother with court-ordered custody who voluntarily left children with paternal grandparents for three weeks to find new home—termination of parental rights not authorized under guardianship scheme and nonparent guardianship in any event improper in absence of showing that custodial parent's rights were previously terminated or suspended by court order or were otherwise "suspended by circumstances"); *Doney*, 174 Mont. at 285-87, 570 P.2d at 577-78 (reversing denial of termination of limited purpose temporary guardianship, created on stipulation of sole surviving parent and deceased wife's sister, after accomplishment of purpose based on district court finding that continued custody with kinship nonparent guardian better served best interests and welfare of child vis-à-vis return to remarried father whose rights had not been terminated or suspended in a state-prosecuted Title 41 abuse/neglect proceeding); *Henderson v. Henderson*, 174 Mont. 1, 5-10, 568 P.2d 177, 179-82 (1977) ("best interests" child custody proceeding under § 40-4-212, MCA (Uniform Marriage and Divorce Act (UMDA)), and/or Title 72, MCA, best interest/welfare of child guardianship proceedings, are not proper statutory avenues for termination or infringement of constitutional rights of parent vis-à-vis nonparent claimant).  Regardless of the particular scheme at issue, statutory schemes recognizing nonparent child custody or visitation rights must be construed "as will preserve the constitutional rights of the parties." *A.R.A.*, 277 Mont. at 70, 919 P.2d at 391.

¶36 Here, in the context of a UMDA marital dissolution proceeding under Title 40, chapter 4, MCA, Surrogate's dissolution petition in pertinent part asserted that she and Father "have one minor child, T.S.J. (age 9 months)," and thus prayed for a corresponding initial parenting plan. *See* §§ 40-4-101(3), (4), -105(1)(d), (e), -201(1), -212, -221, -233, and -234, MCA (determination of initial child custody parenting plans among *existing parents* incident to marital dissolution, separation, or declaration of invalidity).[12] However, as merely the gestational surrogate birth mother, Surrogate was not a biological parent of the subject child, who is undisputedly the exclusive product of genetic materials provided by Father and an anonymous ovum donor. Nor had she been previously adjudicated as a parent of the child by other legal means such as adoption. Moreover, as manifest in their express reference to parenting, parental contact, and parenting plan, the general UMDA parenting plan provisions neither provide for nor otherwise apply as a statutory basis or authorization upon which to assert a nonparent claim for adjudication of parental/child custody or visitation rights, and a resulting parenting plan, vis-à-vis an existing legal parent. *See* §§ 40-4-201(1), -212 through -220, -233, and -234, MCA; *Henderson*, 174 Mont. at 5-10, 568 P.2d at 179-82.

¶37 However, in accordance with the legislative "policy" and intent expressly stated in § 40-4-227, MCA (recognition of separate constitutional rights of existing parents and subject child, "the integrity of the family unit," the "best interests of the child," and that "it

---

[12] *See also* §§ 40-4-213, -219, and -220, MCA (interim parenting plans, amended parenting plans, and affidavit practice for interim and amended parenting plans).

34

is in the best interests of [the] child to maintain" the parent-child relationship in accordance with the parent's constitutional right to "control of [the] child" except "when the parent has [not] demonstrated a timely commitment to the responsibilities of parenthood" and his or her "conduct is contrary to the child-parent relationship"), the Legislature has provided a substantive claim for adjudication of a nonparent "parental interest in a child" upon proof "by clear and convincing evidence" that:

> (1)   the existing parent "has engaged in conduct that is contrary to the child-parent relationship";
>
> (2)   "the nonparent has established" "a child-parent relationship" with the child; and
>
> (3)   "it is in the best interests of the child to continue" the child-parent relationship between the nonparent and the child.

Section 40-4-228(2), MCA (1999 Mont. Laws ch. 414, § 4).[13]   As referenced in § 40-4-228(2), MCA, the term "child-parent relationship" is defined by reference to the definition of the same term stated in § 40-4-211(6), MCA.   *See* § 40-4-228(1), MCA (referring to "cases when a nonparent seeks a parental interest in a child under [§] 40-4-211," MCA); § 1-2-107, MCA (definition of any word or phrase defined in any part of the MCA applicable to same word or phrase used in other parts "except where a contrary intention plainly appears").   As part of another of the three substantive elements of a nonparent "parental interest" claim under § 40-4-228(1), MCA, § 40-4-228(2)(b),

---

[13] Section 40-4-228(3), MCA, separately provides that "[f]or purposes of an award of [nonparent] visitation rights . . . a court may order visitation based on the best interests of the child."   Whether § 40-4-228(3), MCA, comports with fundamental constitutional rights of an existing parent as at issue in *Troxel*, *supra*, is not at issue here.

MCA, similarly references the term "best interests of the child" as determined under the criteria specified in § 40-4-212, MCA. *See* § 1-2-107, MCA (definition of any word or phrase defined in any part of the MCA applicable to same word or phrase used in other parts "except where a contrary intention plainly appears"). However, as referenced in § 40-4-228(2)(a), MCA, the term or phrase parent "conduct . . . contrary to the child-parent relationship" is not currently statutorily defined other than by declaration that it does not require evidentiary proof and finding that the existing parent at issue is "unfit." Section 40-4-228(5), MCA. *See similarly Kulstad*, ¶¶ 58, 60-63, and 68-70 (nothing in § 40-4-228, MCA, "limits its application to a finding of abuse or neglect" as defined in Title 41, chapter 3, MCA—citing § 40-4-228(5), MCA, and *Troxel*, 530 U.S. at 73, 120 S. Ct. at 2064 (plurality opinion passing on question of whether constitutional rights of existing parent effects a per se requirement for a showing of actual or potential parental harm as condition precedent to infringement by recognition of nonparent visitation rights), and distinguishing *Polasek v. Omura*, 2006 MT 103, ¶¶ 14-15, 332 Mont. 157, 136 P.3d 519 (statutory grant of grandparent visitation requires showing rebutting constitutional presumption that a "fit" parent's objection to the requested visitation is in child's best interests—citing *Troxel*, 530 U.S. at 72-74, 120 S. Ct. at 2064 (plurality opinion that "best interests" standard insufficient alone to override existing parent objection to recognition of nonparent visitation rights)), and *J.N.P.*, ¶ 26 ("best interests" standard insufficient alone to override constitutional rights of existing parent objecting to nonparent guardianship)). As a non-exhaustive example, § 40-4-228, MCA, further provides that:

36

voluntarily permitting a child to remain continuously in the care of others for a significant period of time so that the others stand in loco parentis to the child is conduct that is contrary to the parent-child relationship.

Section 40-4-228(4), MCA. "[I]n order to stand in loco parentis to another, a person must intentionally assume the status of a parent by accepting those responsibilities and obligations incident to the parental relationship without benefit of legal adoption." *Kulstad*, ¶ 83 (internal punctuation and citation omitted).[14] Section § 40-4-228(4), MCA, "provides merely one example" of how an existing "parent's conduct may be contrary to the child-parent relationship." *Kulstad*, ¶ 86.

¶38 However, apart from the general reference to a nonparent "parental interest" claim "under [§] 40-4-211" in § 40-4-228(1), MCA, and reference to a "child-parent relationship" as one of the substantive elements of proof of such claims in § 40-4-228(2)(b), MCA, the limited purpose and effect of § 40-4-211, MCA, has been to specify four alternative prerequisites for exercise of Montana subject matter jurisdiction regarding child custody disputes in cases implicating overlapping or conflicting *interstate child custody jurisdiction issues*, first in relation to the Uniform Child Custody Jurisdiction Act (UCCJA) and later in relation to its successor Uniform Child Custody Jurisdiction and Enforcement Act

---

[14] *Compare* § 40-4-211(6), MCA (defining "child-parent relationship" as "a relationship that: (a) exists or did exist, in whole or in part, preceding the filing of" the action, and "in which a person provides or provided for the physical needs of a child by supplying food, shelter, and clothing and provides or provided the child with necessary care, education, and discipline; (b) continues or existed on a day-to-day basis through interaction, companionship, interplay, and mutuality that fulfill the child's psychological needs for a parent as well as the child's physical needs; and (c) meets or met the child's need for continuity of care by providing permanency or stability in residence, schooling, and activities outside of the home").

(UCCJEA).[15] *In re L.D.C.*, 2022 MT 161, ¶¶ 15-22, 409 Mont. 439, 516 P.3d 631. Despite a lack of legislative coordination that has resulted in apparently conflicting provisions of § 40-4-211, MCA, and § 40-7-201, MCA (corresponding UCCJEA predicate for exercise of Montana child custody jurisdiction in cases with interstate jurisdictional issues), § 40-4-211, MCA, nonetheless remains an integral part of the UCCJA/UCCJEA-related limitation on the otherwise broad subject matter jurisdiction of Montana courts regarding substantive parenting/child custody determinations and related parenting plan claims involving interstate jurisdictional issues. *L.D.C.*, ¶¶ 15-22 (noting § 40-4-211, MCA, "as part, albeit an anomalous part, of the [1999] UCCJA/UCCJEA statutory scheme").[16]

¶39    Against that statutory backdrop, the nonspecific reference in § 40-4-228(1), MCA, to a "nonparent" claim for "a parental interest . . . *under [§] 40-4-211*," MCA (1999 Mont. Laws ch. 414, § 4—emphasis added), thus seemingly refers to § 40-4-211(4)(b) and (6), MCA (as amended 1999 Mont. Laws ch. 414, § 1), as the source of a substantive nonparent "parental interest" claim. However, the Legislature amended § 40-4-211(4)(b) and (6), MCA, in conjunction with the enactment of § 40-4-228(2), MCA, which specifies the actual substantive elements of proof of the nonparent "parental interest" referenced in

---

[15] Title 40, chapter 7, MCA (UCCJEA).

[16] A similar lack of legislative coordination and clarity occurred when the Legislature included § 40-4-211, MCA (limiting state subject matter jurisdiction regarding UMDA child custody claims involving interstate jurisdictional issues—originally § 48-331(1), RCM (1947) (1975 Mont. Laws ch. 536, § 31)), as a "stand-alone interstate child custody jurisdiction provision" in the Montana UMDA, "isolated and unmoored" from the related provisions of the then as-yet enacted interstate UCCJA. *See L.D.C.*, ¶¶ 15-19.

§ 40-4-228(1), MCA, as distinct from the threshold nonparent "child-parent relationship" standing requirement specified in § 40-4-211(4)(b) and (6), MCA. *See* § 40-4-228, MCA (1999 Mont. Laws ch. 414, § 1 and 4). Construed in context of each other distinct from the § 40-4-211(4)(b) standing requirement, § 40-4-228(1) and (2), MCA, merely incorporate the "child-parent relationship" definition specified in § 40-4-211(6) by reference as a term included in the specified substantive elements of proof for a nonparent "parental interest" claim. *Compare* § 40-4-228(1)-(2), MCA, with § 40-4-211(4)(b) and (6), MCA. Thus, despite imprecise prefatory language in § 40-4-228(1), MCA, § 40-4-228(2)—not § 40-4-211(4)(b) and (6)—specifies the substantive elements of proof of a nonparent "parental interest," which in turn is an implied condition precedent to determination of a nonparent-involved "parenting plan" as referenced in §§ 40-4-212 through -220, -233, and -234, MCA. *See In re Parenting of D.A.H.*, 2005 MT 68, ¶¶ 8-14, 326 Mont. 296, 109 P.3d 247 (noting in context of disputed grandparent visitation claim with interstate jurisdiction issues governed by UCCJEA that § 40-4-211, MCA, "defines a court's jurisdictional authority for [UMDA] child custody or parenting proceedings"; § 40-4-211(4)(a) and (b), MCA, "identify those persons who may commence parenting proceedings" within that framework; § 40-4-211(4)(b) and (6), MCA, impose a special standing requirement applicable to nonparent claims; and grandparents failed to assert a substantive statutory claim for adjudication of nonparent visitation rights and thus lacked standing beyond assertion of "child-parent relationship" under § 40-4-211(4)(b) and (6), MCA). Consequently, even as amended in 1999, § 40-4-211(4)(b) and (6), MCA, have no

39

purpose or effect other than to specify a special standing requirement for nonparent "parental interest" and related nonparent-involved UMDA "parenting plan" claims involving interstate jurisdictional issues. *See L.D.C.*, ¶¶ 15-22 (construing § 40-4-211, MCA, in re "parenting matters" with interstate jurisdictional issues now governed by the UCCJEA); *D.A.H.*, ¶¶ 8-14 (recognizing and applying § 40-4-211(4)(b) and (6), MCA, as a threshold standing requirement, rather than as substantive elements of proof, for nonparent (i.e., grandparent) visitation claims with interstate jurisdiction issues now subject to the UCCJEA[17]).[18]

---

[17] *See also Kulstad*, ¶ 63 (noting that subject nonparents in *J.N.P.*, *supra*, "could not rely upon [subject] nonparental statutes in seeking custody" of subject child "in light of their failure to comply with the statutory pre-requisites of first establishing a child-parent relationship" as specified "under § 40-4-211, MCA"—citing *D.A.H.*, ¶ 9, *supra*). *See similarly In re L.F.A.*, 2009 MT 363, ¶ 16, 353 Mont. 220, 220 P.3d 391 (§§ 40-4-211 and -228, MCA, "place clear restrictions on the circumstances under which a nonparent may claim a child-parent relationship . . . and bring a parenting plan action").

[18] As implicated in *D.A.H.*, ¶¶ 8-14, § 40-4-211(1) and (4), MCA, manifests the subtle but critically important analytical distinctions between subject matter jurisdiction (whether court has the power and authority to adjudicate a particular type of substantive claim at issue), standing (whether the subject claimant is a proper party to assert the substantive claim at issue), and substantive cognizability (whether the asserted claim for relief at issue is a cognizable legal claim the proof of which will entitle the claimant to the requested relief at law or in equity). *See Gottlob v. DesRosier*, 2020 MT 210, ¶¶ 7-10, 401 Mont. 50, 470 P.3d 188 (distinguishing Rule 12(b)(1) subject matter jurisdiction challenge from Rule 12(b)(6) substantive cognizability challenge); *Larson v. State*, 2019 MT 28, ¶¶ 17-19, 394 Mont. 167, 434 P.3d 241 (distinguishing between subject matter jurisdiction to adjudicate a particular type of claim, justiciability as a "prerequisite to the initial and continued *exercise* of [subject matter] jurisdiction," and substantive cognizability of claim at issue—emphasis added); *Larson*, ¶¶ 45-46 ("[s]tanding is a threshold requirement of justiciability applicable to all [substantive] claims for relief" with "narrow[] focus[] on whether . . . particular claimant is a proper party to assert the claim regardless of whether the claim is otherwise cognizable or justiciable"—standing generally requires substantively cognizable claim involving "an alleged wrong or illegality that has in fact caused, or is likely to cause, [claimant] to personally suffer specific, definite, and direct harm" or interference "to person, property, or exercise of right"); *Ballas v. Missoula City Bd. of Adjustment*, 2007 MT 299, ¶¶ 11-18, 340 Mont. 56, 172 P.3d 1232 (distinguishing subject matter jurisdiction to adjudicate the particular type of substantive

¶40     Here, in response to Father's motion to dismiss her initial petition-asserted UMDA "parenting plan" claim, Surrogate essentially asserted that: (1) the court had "jurisdiction" to adjudicate her parenting plan claim because Montana is the "home state" of the child as referenced in § 40-4-211(1)(a), MCA; (2) she had a "child-parent relationship" with the child as referenced in § 40-4-211(6), MCA, based on the parent-child declaration in the parties' premarital agreement and her subsequent involvement and relationship with the child; and (3) thus her parenting plan claim was cognizable under "the best interests standard" set forth in § 40-4-212, MCA. In a separate motion for "parental rights" in response to Father's motion to dismiss her initial parenting plan claim, she asserted that she: (1) had a "child-parent relationship" with the child based on the parent-child interest provision in the parties' premarital agreement and her subsequent involvement and relationship with the child; (2) "could provide" the child "stability and continuity" under the bests interests standard in § 40-4-212, MCA; and (3) thus "satisfied the requirements of" §§ 40-4-211 and -228, MCA, and was therefore entitled to a UMDA parenting plan regarding the child upon dissolution of her marriage to Father. In accordance with our longstanding command that parties and district courts must identify and adhere to the applicable statutory scheme for consideration and adjudication of a nonparent claim for parental/child custody or visitation right,[19] we note that the originally asserted and proper

case or controversy at issue from legal standing as a threshold justiciability requirement that claimant have a direct "personal stake" in the claim).

[19] *See, e.g.*, *D.A.H.*, ¶¶ 8-14; *Girard*, ¶ 24; *Aschenbrenner*, 182 Mont. at 552-53, 597 P.2d at 1164.

statutory scheme for consideration and adjudication of Surrogate's nonparent "parental interest" claim incident to marital dissolution is § 40-4-228, MCA, without regard to the special standing requirement of § 40-4-211(4)(b), MCA, in cases involving interstate jurisdictional issues. *See* § 40-4-228(1), MCA (pertinent "provisions of" Title 40, chapter 4, MCA, "apply" "[i]n cases when a nonparent seeks a parental interest in a child under [the UMDA]"). Consequently, the mandatory legal condition precedent or prerequisite for a nonparent entitlement to a "parenting plan" determination under the general provisions of §§ 40-4-212 through -220, -233, and -234, MCA, is a prior or predicate adjudication of a nonparent "parental interest" under § 40-4-228(1), MCA, upon proof of the substantive elements specified by § 40-4-228(2), MCA.

¶41 In August 2021, following an evidentiary hearing, the District Court issued written findings of fact, conclusions of law, and a judgment ultimately finding and concluding that Surrogate had an established "child-parent relationship" with the child as defined by § 40-4-211(6), MCA, based on the parent-child relationship declaration in the parties' premarital agreement and her subsequent involvement with the child, and thus had legal standing "to establish a parenting plan" pursuant to § 40-4-211(4)(b), MCA. Following a subsequent bench trial, the court issued additional written findings of fact, conclusions of law, and a final decree in February 2022 which: (1) dissolved the parties' marriage; (2) apportioned their property and assets; (3) incorporated by reference its prior August 2021 findings, conclusions, and judgment; and (4) imposed a stipulated parenting plan (placing the child in the primary residential custody of Surrogate subject to Father's

42

specified visitation) with express recognition that the otherwise stipulated "de facto" parenting plan was subject to Father's previously asserted objections to Surrogate's parental rights and parenting plan claims.

¶42     However, beyond concluding that Surrogate had *standing* to assert a nonparent "parenting plan" claim, the District Court's analysis neither referenced § 40-4-228, MCA, nor any of its required elements of proof for adjudication of the threshold "parental interest" implicitly required as a condition precedent to assertion of a UMDA "parenting plan" claim. *See, e.g.*, §§ 40-4-212, -233, and -234, MCA. By then proceeding to impose a "parenting plan" in favor of Surrogate as referenced in §§ 40-4-212, -233, and -234, MCA, based merely on its prior finding that Surrogate had established a "child-parent relationship" with the child, and a new finding that the conditionally stipulated parenting plan[20] was "in [the child's] best interests" as referenced in §§ 40-4-212 and -228(2)(b), MCA, the District Court erroneously adjudicated a nonparent "parental interest," as referenced in § 40-4-228(1), MCA, in favor of the nonparent Surrogate based on an established "child-parent relationship" and continuation in the "best interests of the child" requirements of § 40-4-228(2)(b), MCA, but without reference or finding that Father engaged "in conduct . . . contrary to the child-parent relationship" as required by § 40-4-228(2)(a), MCA.

---

[20] The otherwise stipulated parenting plan was conditional in the sense that the District Court expressly noted that it was imposed subject to Father's prior objections to Surrogate's claimed parental interest and derivative parenting plan claim.

¶43 Tacitly acknowledging the court's manifest error, Surrogate asserts that we should nonetheless affirm based on our implied findings doctrine. Based on the presumption that a lower court judgment is correct, and that we must therefore draw every reasonable inference to support that presumption on appeal, our implied findings doctrine provides that any specific finding of fact not expressly made, but necessary to prove an essential element of a claim or defense at issue, is implied if supported by the record evidence and the implied finding is not inconsistent with any express finding that is not clearly erroneous. *In re Marriage of Bessette*, 2019 MT 35, ¶ 26, 394 Mont. 262, 434 P.3d 894; *Interstate Brands Corp. v. Cannon,* 218 Mont. 380, 384-85, 708 P.2d 573, 576 (1985); *Berry v. Romain*, 194 Mont. 400, 407-08, 632 P.2d 1127, 1132 (1981); *Poulsen v. Treasure State Indus., Inc.*, 192 Mont. 69, 77-78, 626 P.2d 822, 827 (1981). We will then affirm a challenged judgment despite the lack of a specific finding of fact necessary thereto if the express findings made, and others properly implied under the doctrine, are sufficient together to satisfy the essential elements of proof required for the judgment. *See Poulsen*, 192 Mont. at 78, 626 P.2d at 827 (quoting *Boas v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 125 P.2d 620, 623-24 (Cal. Ct. App. 1942)); *In re D.L.B.*, 2017 MT 106, ¶¶ 26-32, 387 Mont. 323, 394 P.3d 169 (McKinnon, J., specially concurring) (*inter alia* citing *Poulsen* and *Boas*). However, as a narrow exception to the general rule, the implied findings doctrine "appl[ies] to satisfy express statutory requirements . . . only if specific evidence referenced in other express findings clearly supports the implied statutory finding." *D.L.B.*, ¶¶ 14 and 19 (doctrine inapplicable to satisfy express statutory requirements for involuntary mental

health commitments infringing fundamental constitutional rights because such application "would effectively override and disregard the express . . . mandates" of those statutes).[21]

¶44 In her motion for adjudication of parental rights, Surrogate asserted, *inter alia*, that Father "acted contrary to his parent-child relationship when he ceded his exclusive parenting authority by living with [her], marrying [her], allowing [her] to financially provide for [the child], and allowing [her] to parent [him]." Citing *Kulstad*, ¶ 78, she similarly asserts on appeal that, for purposes of § 40-4-228(2)(a), MCA, "'acting contrary to parental authority' includes ceding parental authority" to a nonparent. In *Kulstad*, in the context of a nonparent "parental interest" claim asserted by the nonparent spouse against her same-sex spouse who was the adopted parent of the subject children, we held that the district court's finding under § 40-4-228(2)(a), MCA, that the adopted parent "repeatedly and continually" acted contrary to the child-parent relationship, was not clearly erroneous based on clear and convincing evidence that the "natural mother [of one child] relinquished custody to the parties" jointly, the law did not then allow same-sex parties to legally adopt children, the married couple thus agreed that only one would adopt the children but that they would nonetheless be "co-parent[s]," they equally shared in the rights and responsibilities of parenting the children over a 6-year period, and that the adoptive parent thus "ceded" her theretofore "exclusive parenting authority" to her spouse on a shared basis. *Kulstad*, ¶¶ 9-10, 76, 78-80, 83, and 85.

---

[21] *See also In re B.A.F.*, 2021 MT 257, ¶ 15, 405 Mont. 525, 496 P.3d 554 (state statutory scheme for involuntary civil commitments infringes fundamental constitutional liberty rights/interest and therefore must be strictly adhered to).

¶45 Similarly, in *In re L.F.A.*, 2009 MT 363, 353 Mont. 220, 220 P.3d 391, we held that the district court correctly found that the natural parent acted contrary to the child-parent relationship based on uncontested evidence that, by agreement, the biological mother and her cohabiting female partner jointly co-parented the subject children in every regard from birth for over 12 years prior to the breakup of their relationship. *L.F.A.*, ¶¶ 5-6 and 22-23. The court thus found that the biological parent voluntarily allowed the children to remain in the continuous care of her nonparent partner "for a significant period" such that the nonparent stood in "*loco parentis* to the children," and thereby "relinquished a portion of her parental authority to" the nonparent for purposes of § 40-4-228(2)(a), MCA. *L.F.A.*, ¶¶ 22-23.

¶46 In contrast, in *In re N.M.V.*, 2016 MT 322, 385 Mont. 479, 385 P.3d 564, we held that the district court's finding under § 40-4-228(2)(a), MCA, that the biological mother "did *not* cede her parenting authority" to a cohabiting nonparent male partner who occasionally helped her and developed a relationship with the subject child over an 8-year period was not clearly erroneous based on substantial evidence that the parent ultimately "made all critical decisions" regarding the child's "upbringing" ("including . . . healthcare, daycare, and the everyday rules"); the parent paid for household utilities, groceries, and later $500 in monthly rent to the nonparent; neither party "entered their relationship with the intent that [the nonparent] would be considered a co-parent"; and the nonparent "never assumed an equal parenting role or equal responsibility with [the parent] in raising" the child. *N.M.V.*, ¶¶ 3-4 and 8-9 (emphasis added).

¶47 As a preliminary matter here, the record circumstances and resulting express findings of the court are analogous to those in *Kulstad* and *L.F.A.* only insofar that the court found that: (1) the parties agreed to get married and then raise the child together as co-parents, which they often did over the next 8-9 months when Father and child were staying in Surrogate's homes until their relationship deteriorated and Surrogate filed for divorce; (2) their agreement and conforming conduct allowed Surrogate to "develop[] a strong, loving bond" with the child; (3) Surrogate "continuously" and well "cared for" the child's "physical, emotional, and psychological needs" (*inter alia* including the provision of "food, shelter, clothing, toys, and medical care") "on a daily basis" when the child was in her homes; and (4) Surrogate established a strong maternal bond with the child before the parties' agreed relationship deteriorated. However, unlike in *Kulstad* and *L.F.A.*, the District Court made no finding under § 40-4-228(2)(a), MCA, as to whether Father engaged in conduct "contrary to the child-parent relationship" or, in other words, ceded his parental rights or authority to Surrogate or allowed her to stand in loco parentis to the child. Moreover, unlike in the nonparent child-parent relationships that developed over 12 and 6 years respectively in *L.F.A.* and *Kulstad*, the short-lived child-parent relationship between Surrogate and the child here involved a newborn infant and a co-parenting relationship that was only recently developed over a period of 8-9 months.[22] Further unlike in *Kulstad* and *L.F.A.*, where the couples clearly intended and established traditional family units that were

---

[22] The marital and shared parenting relationship between Father and Surrogate lasted only 8-9 months from the execution of their premarital agreement through their marriage, deterioration of their relationship and Father's denial of further Surrogate access to the child, and Surrogate's responsive petition for dissolution and interim and final parenting plans.

untraditional only in the immaterial sense that they were same sex couples, the nature of the couple's relationship here is far more ambiguous as to whether they similarly intended and established a true familial unit with shared parental bonds and roles or, alternatively, merely a relationship of practical convenience with primary focus on serving their divergent individual interests, with Surrogate's interest in coequal parental rights, as distinct from her agreed caregiver role, developing only as a unilateral incident of their untraditional marriage of convenience. *See L.F.A.*, ¶ 21 (under § 40-4-228, MCA, mere "caregivers are not entitled to parental rights merely by virtue of their caregiver status"). In more technical terms, unlike in *Kulstad* and *L.F.A.*, the record is unclear here as to whether Surrogate not only established a "child-parent relationship" with the child as referenced in § 40-4-228(2)(b), MCA, and defined by § 40-4-211(6), MCA, but whether as a result of the parties' mutual agreement, she further "continuously" stood "in loco parentis to the child" as referenced in § 40-4-228(4), MCA, and defined in *Kulstad*, ¶ 83 (citation omitted). *Kulstad* and *L.F.A.* are thus factually and legally distinguishable here.

¶48 As pertinent, the District Court's express findings of fact clearly pertain and correlate to the "child-parent relationship" and continuation of the nonparent relationship in the "best interests of the child" requirements specified by § 40-4-228(2)(b), MCA, for proof of a nonparent "parental interest" claim. Analysis of a nonparent "parental interest" claim under § 40-4-228(1)-(2), MCA, necessarily involves a highly "fact-intensive" analysis based on the particular facts and circumstances in each case. *N.M.V.*, ¶ 9. Here, as pertinent to the parties' parental interest and parenting plan dispute, the court's August

2021 and February 2022 findings of fact, conclusions of law, and judgments manifestly focused exclusively on Surrogate's establishment of a "child-parent relationship" as a threshold *standing* requirement, and the parties' prior "de facto" parenting plan as evidence that continuation of that relationship would be in the "best interests" of the child for purposes of the court's ultimate parenting plan determination. Those express findings, conclusions, and judgments thus manifest no indication of any recognition of conduct "contrary to the child-parent relationship" as an essential element of proof of a nonparent "parental interest" claim, as distinct from the other essential elements of proof for such claims. *Compare* § 40-4-228(2)(a) with -228(2)(b), MCA. We recognize that an implied finding of fact that Father engaged in conduct "contrary to the child-parent relationship" would not necessarily be inconsistent with the District Court's express findings. However, given the short duration of the parties' relationship, the young age of the undeveloped newborn child, and the uniquely ambiguous nature of the parties' relationship and motives, we cannot conclude that the court's limited express findings, even when coupled together with the underlying evidentiary record viewed in a light favorable to Surrogate, are sufficient to "show[] by *clear and convincing* evidence" that Father engaged in conduct "contrary to the child-parent relationship" as required by § 40-4-228(2)(a), MCA (emphasis added), and illustrated by non-exhaustive example in § 40-4-228(4), MCA. Under the unique circumstances of this case, such an implied finding would be tantamount to a de novo finding of fact by this Court, a matter beyond the proper scope of appellate review.

¶49 Based on the fact that Surrogate "pled" a nonparent parental rights claim under § 40-4-228, MCA, and the assertion that "the proceedings here clearly indicate that the District Court believed it had properly granted the parental interest petition," the Dissent would thus remand "for the District Court to enter the omitted findings." Dissent, ¶¶ 55-56. However, the record simply does not reflect the predicate Dissent assertion regarding the District Court's apparent "belief." As a threshold matter, Surrogate did not properly "plead" a § 40-4-228 nonparent parental rights claim as required by M. R. Civ. P. 7(a)(1)-(2), 8(a)(1), 12(a)(1), 13(a)(1), and 15(a)(1)-(2).[23] Even if we overlook her manifest failure to comply with the clear procedural requirements for placing such substantive claim at issue, Surrogate's informal motion and accompanying affidavit pled no facts supporting her assertion that Father engaged in conduct "contrary to the child-parent relationship" as referenced in § 40-4-228(2)(a), MCA, beyond his agreement to share his "exclusive parenting authority by living with me, marrying me, [and] allowing me to financially provide for . . . [and] parent" his child. Contrary to Surrogate's assertion, neither *Kulstad* nor *L.F.A.* stand for the proposition that a parent's consent to communal, or even marital, sharing of parental functions and duties necessarily constitutes conduct "contrary to the child-parent relationship," as referenced in § 40-4-228(2)(a), MCA.[24]

_____

[23] Rather, she filed an informal *motion* for "for parental rights," without leave of court over five months after Father timely answered her originally-pled October 2020 marital dissolution and "parenting plan" claim, and in response to his motion to dismiss her parenting plan claim due to lack of jurisprudential standing.

[24] Illustrating the critical significance of a nonparent claimant's litigation strategy and conduct, it stands to reason that, by the same token that a parent's communal sharing or delegation of parenting functions and responsibilities could conceivably, *in combination with other unique*

50

Thus, even if we liberally construe it *arguendo* as procedurally sufficient to state such a claim, Surrogate's informal motion for nonparent parental rights was still substantively insufficient on its face to plead facts which, if taken as true, were sufficient to satisfy the express statutory claim requirement for proof of conduct "contrary to the child-parent relationship."

¶50     One step further, even if we assume *arguendo* that Surrogate did sufficiently "plead" a statutory nonparent parental rights claim, she still had the burden of proving all essential elements of the claim by "clear and convincing evidence."   Section 40-4-228(2), MCA. First, the Dissent assertion that the District Court "believed" that Surrogate met her burden of proof, and then the court simply neglected to expressly make the corresponding requisite finding of parental conduct "contrary to the child-parent relationship," is belied by our foregoing analysis, to which the Dissent "do[es] not disagree," that the record and the express findings made by the District Court are insufficient bases upon which to invoke our implied findings doctrine to conclude that the court implicitly found by clear and convincing evidence that Father engaged in conduct "contrary to the child-parent relationship" as required by § 40-4-228(2)(a), MCA.  The record is further conspicuously

---

*circumstances at issue in a particular case*, as in *Kulstad* and *L.F.A.* for example, be deemed parental conduct "contrary to the child-parent relationship" as a matter of fact, so too could such conduct, in combination with the other unique circumstances in another case, contrarily be deemed parental conduct *in furtherance of* the child's best interests, and thus *not* parental conduct "contrary to the child-parent relationship."  Either way, the statutory burden is on the nonparent to prove that the alleged parental conduct is "contrary to the child-parent relationship" by "*clear and convincing evidence*."  Section § 40-4-228(1)-(2), MCA (emphasis added).  *See also Troxel*, 530 U.S. at 68-70, 120 S. Ct. at 2061-62 (citing *Parham*, 442 U.S. at 602, 99 S. Ct. at 2504 (in re rebuttable presumption, that a parent will naturally act in the best interests of his or her child, underlying fundamental right of parent to parental exclusivity vis-à-vis a nonparent)).

devoid of *any* motion or trial briefing, testimonial, or closing argument assertion or showing that Father's agreement to share his exclusive parenting functions and responsibilities with Surrogate was in any way detrimental or contrary to the best interests of his child under the unique factual circumstances of this case. Moreover, Surrogate's own proposed findings of fact, conclusions of law, and judgment, upon which she expressly chose to rely in support of her informal nonparent parental rights motion in lieu of any closing argument, were devoid of *any* proposed finding or conclusion expressly referencing or substantively corresponding to the parental conduct "contrary to the child-parent relationship" requirement of § 40-4-228(2)(a), MCA. Thus, even if she properly pled the claim as a threshold matter, Surrogate ultimately failed to present evidence and argument supporting all essential elements of a statutory nonparent parental rights claim, not just the "child-parent relationship" and continuation in the "best interests" elements of the claim.

¶51 Certainly, we have discretion, in an appropriate case independent of our implied findings doctrine, to remand for additional requisite findings of fact as required by M. R. Civ. P. 52(a), but generally only when the lower court evidentiary record is insufficient to permit effective appellate review of the lower court decision without us engaging in improper supplemental fact-finding on appeal. *See, e.g.*, *In re Marriage of Banka*, 2009 MT 33, ¶¶ 9-11, 349 Mont. 193, 201 P.3d 830; *Byrum v. Andren*, 2007 MT 107, ¶¶ 53-55, 337 Mont. 167, 159 P.3d 1062; *Snavely v. St. John*, 2006 MT 175, ¶¶ 1-12 and 16, 333 Mont. 16, 140 P.3d 492. However, remand for additional supporting findings of fact is not necessary under Rule 52(a) where the record is sufficient to permit resolution

of the issue as a matter of law.  *Simons v. SW Petro-Chem, a Div. of Witco Chem. Corp.*, 28 F.3d 1029, 1030 (10th Cir. 1994); *Armstrong v. Collier*, 536 F.2d 72, 77 (5th Cir. 1976) (trial court compliance with Rule 52(a) not a jurisdictional prerequisite to appeal—remand for additional findings not necessary where there is a sufficient record basis to resolve the issue on appeal without remand).  Here, the record manifests that Surrogate had a full and fair opportunity to assert and prove her statutory nonparent parental rights claim in a manner of her own choosing.  For whatever reason, her manner of proof and supporting argument simply did not focus on proof of parental conduct "contrary to the child-parent relationship," the element of proof chosen by the Legislature as constitutionally necessary to overcome the underlying parental liberty interest in parental exclusivity and control regarding his or her child based on something more stringent than a mere "best interests of the child" determination.  *See* § 40-4-227, MCA (statement of Legislative policy supporting § 40-4-228(1)-(2), MCA, in balance with parent constitutional rights); *Kulstad*, ¶¶ 70-74 (distinguishing more stringent elements of § 40-4-228(1)-(2), MCA, nonparent parental rights claim from broad "best interests"-based Washington statutory nonparent visitation claim at issue in *Troxel*); *Troxel*, 530 U.S. at 68-70, 120 S. Ct. at 2061-62 (citing *Parham*, 442 U.S. at 602, 99 S. Ct. at 2504 (in re rebuttable presumption, that a parent will naturally act in the best interests of his or her child, underlying fundamental right of parent to parental exclusivity vis-à-vis a nonparent)).  Thus, for purposes of assessing whether remand for supplemental findings of fact under M. R. Civ. P. 52(a) is necessary here, the issue is not, as the Dissent asserts, whether the District Court merely neglected to make a

53

required finding on an essential statutory element of proof actually litigated by the parties, but whether Surrogate *actually litigated and met her high statutory burden of proving* that essential element (i.e., parental conduct "contrary to the child-parent relationship") in the prosecution of her claim. Because the record clearly manifests that she did not, and instead focused on the other statutory elements of the claim (i.e., proof of her establishment of a "child-parent relationship" with the child and that continuation of that relationship was in "the best interest of the child"), our recognized practice of remanding for clarifying supplemental findings of fact pursuant to M. R. Civ. P. 52(a) does not apply here. To hold otherwise would unfairly afford the claimant a second opportunity to more adequately prosecute her nonparent claim, further burdening the fundamental constitutional rights of the parent and the best interests of the child in parental stability.[25] Consistently, Surrogate makes no request on appeal for remand for supplemental findings of fact. She instead chose to rely exclusively upon her request for application of our implied findings doctrine *without remand*.

¶52 We hold that the District Court erroneously adjudicated a nonparent "parental interest," as referenced in § 40-4-228(1)-(2), MCA, in favor of Surrogate without the

_____

[25] *See Troxel*, 530 U.S. at 75, 120 S. Ct. at 2065 (finding "no reason to remand" constitutionally deficient Washington nonparent child visitation claim for further litigation in furtherance of the claim because the "burden of litigating" a child custody dispute "can itself be so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated" and the court should thus not "forc[e] the parties into additional litigation that would further burden" the preexisting constitutional right of the parental vis-à-vis a nonparent—internal punctuation and citation omitted). *Accord Kulstad*, ¶¶ 120 and 131 (Rice, J., dissenting) (citing *Troxel*, 530 U.S. at 75, 120 S. Ct. at 2065, and further noting constitutional right of parent "to raise his or her own child" and companion constitutional "right of a child . . . 'to be with his or her natural parent'"—citation omitted).

required predicating finding of fact specified by § 40-4-228(2)(a), MCA (parent conduct "contrary to the child-parent relationship"). We hold further that the court thus erroneously made a resulting child custody "parenting plan" determination involving a nonparent without the predicate "parental interest" implied as a condition precedent to imposition of a "best interests"-based "parenting plan" under the substantive provisions of §§ 40-4-212 through -220, MCA.[26]

## CONCLUSION

¶53 We hold that the District Court correctly concluded that the preclusive terms of the GCA did not preclude Surrogate from later acquiring or establishing a parental interest and right to the extent independently authorized under Montana law. We hold that the District Court correctly found and concluded that Father voluntarily signed the premarital agreement and that it was a validly formed and enforceable contract. We hold further that the District Court did not erroneously reject Father's assertion that the parent-child relationship provision of the parties' premarital agreement was unenforceable as equitably unconscionable.

---

[26] This holding and supporting analysis is limited to the nonparent child custody "parental interest" and "parenting plan" claims at issue without prejudice to an amended Surrogate petition claim filed on proper leave of court on remand, if any, to assert a nonparent "visitation" claim as referenced in § 40-4-228(3), MCA. In that regard, we further hereby affirm the District Court's ultimate finding of fact, and pertinent supporting findings of fact, that Surrogate established a predicate "child-parent relationship" with the subject child as defined by § 40-4-211(6), MCA, and incorporated by reference in § 40-4-228(2)(b), MCA. We make no express or implied opinion or comment, however, on the constitutionality of § 40-4-228(3), MCA, or its proper application in context of the balance of § 40-4-228, MCA.

¶54 We hold further that the District Court erroneously adjudicated a nonparent "parental interest," as referenced in § 40-4-228(1)-(2), MCA, in favor of Surrogate without the required predicate finding of fact specified by § 40-4-228(2)(a), MCA (parent conduct "contrary to the child-parent relationship"). We thus hold at bottom that the court erroneously made a resulting child custody "parenting plan" involving a nonparent without the predicate "parental interest" required as an implied condition precedent to imposition of a "best interests"-based "parenting plan" under the substantive provisions of §§ 40-4-212 through -220, MCA. We therefore reverse the District Court's August 2021 and February 2022 judgments to the extent that they adjudicate a "parental interest" and resulting child custody parenting plan rights regarding the subject child in favor of Surrogate, and remand for entry of an amended final decree of marital dissolution adjudicating Father as the sole parent and custodian of the subject child except as the District Court may subsequently order on the merits of an amended petition filed by Surrogate on proper leave of court on remand, if any, asserting a substantive nonparent "visitation" claim as referenced in § 40-4-228(3), MCA.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON

56

Justice Jim Rice, concurring in part and dissenting in part.

¶55 I agree with the Court's conclusions of law drawn from its extensive analysis of the governing statutes, and the Gestational Carrier Agreement, and therefore concur therein. I also agree with the Court's determination that the District Court erred by "skipping a step" when it failed to enter a "finding that Father engaged 'in conduct [] contrary to the child-parent relationship' as required by § 40-4-228(2)(a), MCA." Opinion, ¶ 41. The Court describes Surrogate as "[t]acitly acknowledging the court's manifest error," and therefore she asks this Court to apply the implied findings doctrine. Opinion, ¶ 42. Indeed, Surrogate concedes this "omission by the lower court of a factual and legal finding" in her briefing. However, Surrogate pled the issue, filing a separate pleading within the dissolution proceeding asking that she be granted a parental interest to the child because "[Father] acted contrary to his parent-child relationship," in accordance with our holding in *Kulstad v. Maniaci*, 2009 MT 326, 352 Mont. 513, 220 P.3d 595, on which she relies on appeal. Opinion, ¶ 43. The District Court entered findings of fact and conclusions of law granting Surrogate's petition, but omitted a "contrary to parental interest" finding, focusing instead on the relationship Surrogate and the child had developed:

> The Court finds that [Surrogate] has developed a strong, loving bond with [T.S.J.] and has been an excellent parent. [Father] has repeatedly acknowledged that [Surrogate] has been a good parent to [T.S.J.] and that he and [Surrogate] have raised [T.S.J.] together. Since [T.S.J.]'s birth, [Surrogate] has, except for a short period of time, continuously cared for [T.S.J.] on a daily basis and has provided for his physical, emotional, and psychological needs. She has consistently provided [T.S.J.] with food, shelter, clothing, toys and medical care. [Surrogate] has provided [T.S.J.] with a safe, stable, and healthy environment in which he is prospering.

57

> [Surrogate] clearly loves [T.S.J.] and the Court finds that [T.S.J.] is also strongly attached to [Surrogate] and to her children.

After ruling in Surrogate's favor, the case then proceeded to trial on the dissolution and parenting plan, and this issue was not revisited.

¶56     I do not disagree with the Court's decision to decline the use of the implied findings doctrine, even though the proceedings here clearly indicate that the District Court believed it had properly granted the parental interest petition, and the proceeding continued thereafter on that premise. However, given the state of the proceeding, I would not decide this issue based upon our review of the record and a survey of our caselaw. Opinion, ¶¶ 43-47. I would remand the matter for the District Court to enter the omitted findings, and then undertake review of the record as necessary for any subsequent challenge to these findings.


/S/ JIM RICE